L. Mitchell COFFEE, Jr. and LMC
Motors, Inc., Plaintiffs,

v.

GENERAL MOTORS ACCEPTANCE
CORPORATION, Defendant.

No. CV 396–019.

United States District Court,
S.D. Georgia,
Dublin Division.

May 19, 1998.

Donald Walker Gillis, Dublin, GA, Joseph J. Burton, Jr., Burton & Anderson, Atlanta, GA, Rosemary S. Armstrong, Atlanta, GA, for Plaintiffs.

Dwight J. Davis, M. Graham Loomis, King & Spalding, Atlanta, GA, for Defendant.

### ORDER

BOWEN, Chief Judge.

Three matters are presently before the Court in the above-captioned case: (1) Defendant's Motion for Summary Judgment, (2) Plaintiffs' "Notice of Objection or in the Alternative Motion to Strike" (Motion to Strike), and (3) Plaintiffs' Motion for Partial Summary Judgment. The Court heard oral argument on these matters on December 12, 1997. After careful consideration of the parties' arguments and the relevant statutory and case law, Plaintiffs' motions are **DENIED** and Defendant's motion is **GRANTED IN PART** and **DENIED IN PART** for the reasons stated below.

### I. BACKGROUND

This case arises out of an inventory financing arrangement between Plaintiff LMC Motors, Inc. (LMC), which operated a General Motors (GM) dealership in Eastman, Georgia, and Defendant General Motors Acceptance Corporation (GMAC), a wholly owned subsidiary of GM. Plaintiff L. Mitchell Coffee, Jr. (Coffee) is the president and sole shareholder of LMC. Coffee first became involved in the automobile business during the late 1980s, when he acquired 49% of the stock in Hilliard, Inc., which at the time operated the GM dealership in Eastman. Coffee made this investment at the request of his friend Zack Hilliard, the dealership's owner. Coffee purchased the remaining stock from Mr. Hilliard in August 1989, and in December of that year GM approved Coffee as a dealer. Coffee operated the dealership under its former name until December 1990, when he changed the corporation's name to LMC Motors, Inc.[1]

Hilliard, Inc. had previously entered into an inventory financing arrangement with GMAC—sometimes referred to as a "floor plan" financing arrangement—which the parties continued following Coffee's acquisition of the dealership. In this type of arrangement, the lender (GMAC) provides a line of credit to the dealership (Hilliard/LMC), which the dealership uses to finance the purchase of vehicles from the manufacturer (GM). On December 27, 1990, Coffee executed several agreements on behalf of LMC in connection with this inventory financing arrangement: (1) a Promissory Note, (2) a Loan Agreement, (3) a Wholesale Security Agreement, (4) an Amendment to the Wholesale Security Agreement, (5) a Guaranty

---

1. The parties generally refer to the corporate entity as LMC despite the fact that its name was not formally changed until December 1990.

Agreement, and (6) a Security Agreement.[2] In general terms, GMAC extended a $1.5 million line of credit to LMC, which the parties agree was intended to permit LMC to finance up to eighty vehicles. GMAC, however, frequently adjusted the number of vehicles it would finance—and hence the amount it would advance on LMC's behalf—based upon a sixty-day supply of vehicles. That is, GMAC would allow LMC to purchase only the number of vehicles that the dealership was likely to sell in a two-month period. According to GMAC, this "sixty-day-supply" rule is standard company policy and is also an accepted guideline within the automobile industry.

Plaintiffs detail several instances in which they allege that GMAC restricted and adjusted LMC's credit limit.[3] While GMAC contests some of these allegations, it admits that it "periodically adjusted LMC's credit limit based on LMC's sales rate and other financial criteria, such as liquidity and capitalization." (Def.'s Am. Brief in Support of its

Mot. for Summ.J. at 4). Furthermore, GMAC admits that it "suspended"[4] LMC's line of credit on two different occasions: once from February to September 1990, and again from March to July 1993. According to GMAC, the 1990 suspension was initiated at Coffee's request after it was discovered that LMC had $650,000.00 in previously undisclosed off-balance sheet debt;[5] according to Plaintiffs, however, GMAC refused to "reinstate" the line of credit until Coffee made an additional $100,000.00 capital contribution to LMC. The 1993 suspension, on the other hand, was initiated by GMAC because a check from LMC to GMAC had been returned for insufficient funds.[6] GMAC conditioned reinstatement of the credit line upon satisfaction of several financial criteria, including an additional capital contribution by Coffee.

On April 5, 1994, GMAC advised LMC that it intended to terminate their inventory financing arrangement and that it would make a formal demand for payment in ninety days.

2. Plaintiffs assert that the December 1990 agreements are identical to ones executed by Coffee on behalf of Hilliard, Inc. in December 1989, and that the 1990 agreements were executed simply to reflect the change in the corporation's name. (Pls.' Statement of Undisputed Facts ¶ 1). GMAC, however, contends that it has been unable to locate copies of the alleged 1989 agreements and that the Plaintiffs have not produced them. Thus, GMAC purports to dispute Plaintiffs' assertion that the 1989 and 1990 agreements are identical. (Def.'s Resp. to Pls.' Statement of Undisputed Facts ¶ 1).

At oral argument, however, counsel for GMAC seemed to concede Plaintiffs' contentions regarding the 1989 agreements:

[Coffee] signed these very contracts with [GMAC] in August of 1989. And immediately [GMAC] said these are the number of cars that we will finance for you and you have to meet these conditions as we go along. That was in August of 1989. We go through all of the rest of 1989 to 1990 and then in 1990 *he signed the exact same agreements again.*

(Tr. at 26) (emphasis supplied). Therefore, for purposes of this Order, I will deem it admitted that the 1989 agreements are identical in all material respects to the December 1990 agreements that are presently in the Record.

3. Specifically, Plaintiffs allege that LMC's credit limit fluctuated as follows:

1. February 1990—Reduced to 65 vehicles.
2. April 1990—Reduced to 60 vehicles.
3. July 1990—Reduced to 35 vehicles.

4. September 1990—Increased to 75 vehicles following $100,000.00 capital contribution by Coffee.
5. April 1991—Reduced to 55 vehicles.
6. May 1991—Reduced to 50 vehicles.
7. August 1991—Reduced to 30 vehicles.
8. February 1992—Increased to 35 vehicles following $25,000.00 capital contribution by Coffee.
9. February 1993—Reduced to 25 vehicles, but with temporary (90–day) increase to 35 vehicles.
10. March 1993,—Credit suspended except for "sold orders."
11. July 1993—Credit reinstated following $30,000 capital contribution by Coffee; limit set at 45 vehicles (30 new, 15 factory auction).
12. July 1994—Financing arrangement terminated.

4. Although the parties refer to these instances as "suspensions" of LMC's line of credit, it appears that LMC nevertheless was permitted to purchase vehicles during these periods, albeit on a restricted and closely monitored basis.

5. The debt had been incurred prior to Coffee's purchase of the corporation.

6. According to the Plaintiffs, this overdraft was the result of a clerical error and a miscommunication within the bank. GMAC disputes this assertion; however, GMAC does not dispute that LMC promptly forwarded certified funds in satisfaction of its payment obligations.

Therefore, on July 5, 1994, GMAC demanded payment of the principal amount outstanding on the line of credit, plus the accrued interest on that amount.[7] At about the same time, Coffee entered into negotiations with two individuals—Frank Andrews and Woody Butts—regarding their potential investment in LMC. Andrews, Butts, and Coffee subsequently formed ABC Motors in July 1994, and ABC Motors in turn executed an asset purchase agreement with LMC. GMAC currently provides floor plan financing to ABC Motors.

It is undisputed and notable that LMC timely paid all amounts owed to GMAC under the terms of the agreement. It also is undisputed that LMC incurred substantial operating losses during its existence.[8] Plaintiffs allege that LMC's losses were precipitated by GMAC's repeated and unjustified reductions in LMC's credit limit and by GMAC's consequent refusal to finance the purchase of new vehicles at certain critical times.[9] GMAC, on the other hand, attributes LMC's losses to poor management, and it further claims that it was justified—and in fact authorized under the agreement—in adjusting LMC's credit limit and in terminating their financing relationship.

Plaintiffs commenced the instant lawsuit in March 1996, asserting no less than eight claims against GMAC: (1) violation of the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221 et seq.; (2) violation of the Georgia Motor Vehicle Franchise Practices Act, O.C.G.A. § 10–1–620 et seq.; (3) breach of contract; (4) promissory estoppel; (5) fraud; (6) negligent misrepresentation; (7) tortious interference with business relations; and (8) tortious interference with contractual relations. Plaintiffs pray for compensatory and punitive [10] damages in excess of $2,500,000.00 and costs and attorney's fees. GMAC seeks summary judgment on all of Plaintiffs' claims, and Plaintiffs seek summary judgment on the sole issue of GMAC's liability for breach of contract. In addition, Plaintiffs have moved to strike Defendant's Exhibit 5 in support of its motion for summary judgment.

## II. SUMMARY JUDGMENT STANDARD

The Court should grant summary judgment only if "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Applicable substantive law determines which facts are material, that is, which facts have the potential to affect the outcome of the trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must "resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his [or her] favor." United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir.1991) (en banc) (internal quotation marks and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for its motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, the nature of the movant's initial burden "varies depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or the non-movant would bear the burden of proof at trial."

7. According to GMAC's demand letter, the amount of principal outstanding was $1,303,739.16, which represented the amount advanced for the purchase of 77 vehicles. (Pls.' Statement of Undisputed Facts, Ex. 35).

8. Plaintiffs purportedly dispute GMAC's assertions that LMC never generated a net annual profit and that it accumulated over $870,000.00 in net losses during its existence. (Pls.' Resp. to Def.'s Statement of Undisputed Material Facts ¶ 9). However, Plaintiffs do not refer the Court to any contrary evidence, nor do they assert that LMC actually operated at a profit. For purposes of this Order, therefore, I will construe Plaintiffs' statement as disputing (1) GMAC's assertion that LMC never generated a net annual profit and (2) the amount of LMC's accumulated losses.

9. For example, Plaintiffs claim that LMC's credit limit was reduced at a time of year when dealers are required to submit "preference orders" to the manufacturer in order to secure the most desirable models.

10. Plaintiffs specifically request punitive damages only in connection with Count II of their Complaint.

*Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993). If the *movant* bears the burden of proof at trial, that party "must show that, on all the essential elements of its case, ... no reasonable jury could find for the non-moving party." *Four Parcels,* 941 F.2d at 1438. On the other hand, if the *non-movant* has the burden of proof at trial, the movant may carry its initial burden either by negating an essential element of the non-movant's case or by demonstrating that there is an absence of evidence to prove a fact necessary to the non-movant's case. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 606–08 (11th Cir.1991) (explaining *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Merely stating that the non-movant cannot meet its burden at trial is insufficient. *Id.*

If—and only if—the movant carries this initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." *Id.* at 608.[11] Again, this burden varies depending upon whether the movant or non-movant bears the burden of proof at trial. If the movant has the burden of proof at trial, the non-movant may avoid summary judgment only by coming forward with evidence sufficient to withstand a motion for directed verdict at trial. *Fitzpatrick,* 2 F.3d at 1116 (citation omitted). If the non-movant bears the burden of proof at trial, the non-movant's response must be tailored to the method by which the movant carried its initial burden. If the movant presented evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." *Id.* If the movant demonstrated an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant, or "come forward with additional evidence sufficient to withstand a

directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* (citation omitted).

The clerk has given each party notice of the opposing party's summary judgment motion, of the right to file affidavits or other materials in opposition, and of the consequences of default. Therefore, the notice requirements of *Griffith v. Wainwright,* 772 F.2d 822 (11th Cir.1985), are satisfied. The time for filing materials in opposition has expired, and the motions are ripe for consideration.

## III. ANALYSIS

As previously observed, both parties have moved for summary judgment on the Plaintiffs' breach of contract claim. The terms of the inventory financing arrangement are at the heart of this case. Accordingly, I first will address the parties contentions with respect to Plaintiffs' contract claim, and I then will proceed to consider Plaintiffs' other claims against GMAC.

### A. *Breach of Contract*

It is undisputed that Plaintiffs' breach of contract claim is governed by Georgia law. Moreover, it is undisputed that the parties had a valid and enforceable agreement which governed their inventory financing arrangement. However, the parties disagree strongly about their respective rights and duties under that agreement.

In Georgia, as elsewhere, the construction of a contract ordinarily is a question of law to be decided by the Court. *See* O.C.G.A. § 13–2–1; *Salvatori Corp. v. Rubin,* 159 Ga.App. 369, 371, 283 S.E.2d 326 (1981). "The cardinal rule of construction is to ascertain the intention of the parties." O.C.G.A. § 13–2–3; *McCann v. Glynn Lumber Co.,* 199 Ga. 669, 674, 34 S.E.2d 839 (1945). Where the terms of a written contract are clear and unambiguous, the Court should determine the parties' intention based solely upon the contract itself. *Health Serv.*

---

11. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. *See Morris v. Ross,* 663 F.2d 1032, 1033–34 (11th Cir.1981). Rather, the non-movant must respond by affidavits or as otherwise provided by Rule 56 of the Federal Rules of Civil Procedure.

*Ctrs., Inc. v. Boddy,* 257 Ga. 378, 380, 359 S.E.2d 659 (1987). Only when the terms of the agreement are ambiguous should the parties' intention be determined by the trier of fact. *Salvatori Corp.,* 159 Ga.App. at 371–72, 283 S.E.2d 326. Whether an ambiguity exists, however, is a question of law for the Court. *Id.* at 372, 283 S.E.2d 326. A contract is considered ambiguous only when, after applying the pertinent rules of construction, it is uncertain which of two or more possible meanings represents the true intention of the parties. *Sims' Crane Serv., Inc. v. Reliance Ins. Co.,* 514 F.Supp. 1033, 1036 (S.D.Ga.1981), *aff'd* 667 F.2d 30 (11th Cir.1982); *see also McCann,* 199 Ga. at 679, 34 S.E.2d 839.

■ With these principles in mind, I now turn to consider the contract at issue. The inventory financing arrangement was principally governed by three written documents: the Promissory Note, the Loan Agreement, and the Wholesale Security Agreement.[12] The parties agree that these documents should be construed together as one contract, as they were executed contemporaneously and cross-reference each other. *See Ameritrust Co., N.A. v. White,* 73 F.3d 1553, 1560–61 (11th Cir.1996); *see also Hardin v. Great Northern Nekoosa Corp.,* 237 Ga. 594, 597, 229 S.E.2d 371 (1976) ("Where instruments are executed at the same time in the course of the same transaction, they should be read and construed together."). The Promissory Note specifies that "ON DEMAND, for value received, [LMC] promise(s) to pay to the order of [GMAC] … the sum of [$1,500,000.00] with interest thereon as specified in paragraph two (2) of the Loan Agreement." The Loan Agreement, in turn, provides in pertinent part:

1. [GMAC] hereby extends to [LMC] a line of credit in the amount of [$1,500,000.00] upon the terms and conditions hereinafter set forth.

2. [LMC] has delivered to [GMAC] a demand promissory note of even date herewith in the amount set forth in paragraph 1 above, which demand promissory note shall bear interest on each advance hereunder from the date of each such advance to the date of the repayment thereof, at the rate designated in security agreements or mortgages executed by [LMC] prior to and subsequent to the date of this Loan Agreement. [LMC] shall repay to [GMAC] the amount of each such advance, plus interest as aforesaid, as provided in said security agreements or mortgages. . . .

3. The line of credit extended hereunder shall be used exclusively for the purposes of acquiring personal property to be placed in [LMC]'s inventory or borrowing money on the security of personal property already held in [LMC]'s inventory or borrowing money on the security of other property acquired by [LMC] for use in business. *[GMAC] will advance funds in payment of said property so acquired or held in an amount not to exceed the aggregate amount of the line of credit set forth in paragraph one (1) above except insofar as provided under paragraph nine (9) of this Agreement [relating to increases in the line of credit]. It is understood and agreed that [GMAC] may, at its option, terminate the line of credit and refuse to advance funds hereunder upon the occurrence of any of the following:* [1] a default by [LMC] in the payment or performance of any obligation hereunder or under any other agreement entered into with [GMAC]; [2] the institution of a proceeding in bankruptcy, receivership or insolvency by or against [LMC] or [its] property; [3] an assignment by [LMC] for the benefit of creditors; [4] cancellation of [LMC]'s General Motors franchise; [5] the filing of a notice of any tax lien against any of [LMC]'s property; [6] a misrepresentation by [LMC] for the purpose of obtaining credit or an extension of credit; [7] a refusal by [LMC], upon request by [GMAC], to furnish financial information to [GMAC] at reasonable intervals or to permit [GMAC] to examine [LMC]'s books and records; or [8] if [LMC], without [GMAC]'s prior written consent, shall: (a)

---

12. The other documents—the Amendment to the Wholesale Security Agreement, the Guaranty Agreement, and the Security Agreement—are also part of the contract, but their terms are not particularly relevant to the parties' rights and duties regarding the line of credit.

guarantee, endorse or otherwise become surety for or upon the obligations of others except as may be done in the ordinary course of [LMC]'s business; (b) transfer or otherwise dispose of any proprietary, partnership or share interest [LMC] has in [its] business, or all or substantially all of the assets thereof; (c) enter into any merger or consolidation, if a corporation; (d) make any substantial or unusual disbursement or use of funds of [LMC]'s business, except as may be done in the ordinary course of [LMC]'s business.

(emphasis supplied). Finally, the Wholesale Security Agreement provides that "[LMC] agree[s] upon demand to pay to GMAC the amount it advances or is obligated to advance to the manufacturer or distributor for each vehicle with interest at the rate per annum designated by GMAC from time to time and then in force under the GMAC Wholesale Plan." In addition, LMC granted GMAC a security interest in its inventory of new and used vehicles, and it further agreed to permit GMAC to take possession of the vehicles in the event of LMC's bankruptcy or default under the security agreement, or in the event that GMAC deemed itself insecure.

Plaintiffs contend that GMAC was obligated under this contract to finance up to $1.5 million worth of vehicles, and that GMAC could refuse to advance funds or terminate the line of credit only upon the occurrence of one of the events enumerated in paragraph 3 of the Loan Agreement. Therefore, Plaintiffs claim, GMAC breached the contract in four distinct ways: (1) by refusing to advance funds to the full extent of LMC's line of credit; (2) by adjusting LMC's line of credit based upon criteria not contained in the contract; (3) by imposing additional terms and conditions upon LMC and Coffee which were not contained in or authorized by their agreement; and (4) by terminating the line of credit in the absence of any event of default.

GMAC, on the other hand, contends that it was not unconditionally obligated to advance $1.5 million on behalf of LMC. Indeed, GMAC argues that it is entitled to summary judgment on Plaintiffs' breach of contract claim because nothing in the relevant documents required it to advance the full amount of LMC's line of credit. Contrary to GMAC's argument, however, the Loan Agreement expressly states that GMAC "*will advance funds* in payment of property so acquired or held *in an amount not to exceed* the aggregate amount of the line of credit." (Loan Agreement ¶ 3) (emphasis supplied). It is true, as GMAC argues, that it was only required to advance funds in payment of vehicles that LMC purchased from GM. However, nothing in the contract documents gave GMAC authority to adjust the number of vehicles that LMC could purchase, nor was the decision to advance funds placed in GMAC's discretion.[13] Under the plain lan-

---

**13.** I note that paragraph 10 of the Loan Agreement incorporates by reference the provisions of the GMAC Wholesale Plan, at least insofar as those provisions are consistent with the terms of the Loan Agreement. GMAC submitted what purports to be a portion of this plan in connection with its Motion for Summary Judgment. (Def.'s Mot. for Summ. J., Ex. 5). This exhibit, however, is the subject of Plaintiffs' Motion to Strike, and therefore I must briefly consider Plaintiffs' motion.

Plaintiffs contend that Exhibit 5 is inadmissible for summary judgment purposes because it is an unsworn and unauthenticated document. *See Burnett v. Stagner Hotel Courts, Inc.*, 821 F.Supp. 678, 683 (N.D.Ga.1993) ("In order for a document to be considered in support of or in opposition to a motion for summary judgment, it must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence."), *aff'd mem.*, 42 F.3d 645 (11th Cir.1994). In response to Plaintiffs' motion, GMAC submitted the affidavit of James Pinsoneault, GMAC's Operations Manager, in which he identifies Exhibit 5 as pages from GMAC's Business Development Reference Guide. This showing is sufficient to meet the authentication requirements of the Federal Rules of Evidence, and therefore Plaintiffs' Motion to Strike is **DENIED.**

Nevertheless, as pointed out by Plaintiffs' counsel at oral argument, this document is dated December 1993, which is long after the execution of the agreements in this case. Moreover, the exhibit is not a copy of GMAC's Wholesale Plan itself, but rather is a summary of that plan excerpted from GMAC's Business Development Reference Guide. Thus, there is no evidence in the Record concerning the terms of the GMAC Wholesale Plan that was in effect in December 1990 (or 1989 for that matter). Moreover, there is nothing in the excerpted pages which clearly states that GMAC has the authority to unilaterally adjust LMC's line of credit. I must note that GMAC does not argue that Exhibit 5 is part of

guage of the agreement, GMAC was required to advance up to, though not more than, $1.5 million on LMC's behalf.

GMAC also argues, however, that it was not obligated to advance the full amount of funds under the line of credit because the arrangement was denominated as a "line of credit." GMAC contends that when a lender extends a line of credit, it does not assume an unqualified obligation to loan the borrower the full amount of funds; rather, the lender may adjust or cancel the line of credit in its sole discretion. This argument is not entirely without authority; in *Midlantic Nat'l Bank v. Commonwealth Gen., Ltd.*, 386 So.2d 31, 33 (Fla.Dist.Ct.App.1980), the court defined a line of credit as follows:

A line of credit is a limit of credit to cover a series of transactions. It does not impart upon the bank the legal responsibility to loan up to the limit or a responsibility of the [borrower] to borrow up to the limit, but merely facilitates the easier extension of credit. Accordingly, if information later comes to light which reflects upon a borrower's ability to satisfy his debts, a bank need not fund the entire line of credit.

(internal citations and footnote omitted).[14]

GMAC has not directed the Court to any other cases adopting its definition of a line of credit, and the Court has been unable to locate any in its own research.[15] Plaintiffs, on the other hand, refer the Court to a slightly different definition of a line of credit:

In the field of finance and banking, the expression, "line of credit," has a well-defined meaning. It signifies a limit of credit extended by a bank to its customer, *to the full extent of which the customer*

*may avail itself* in its dealings with the bank, but which the customer may not exceed.

*Modoc Meat & Cattle Co. v. First State Bank of Or.*, 271 Or. 276, 532 P.2d 21, 25 (1975) (emphasis supplied); *see also Black's Law Dictionary* 928 (6th ed.1990) (citing *Modoc Meat & Cattle Co.*). Under this view, Plaintiffs argue, a lender is obligated to advance funds up to the borrower's credit limit, and it may not reduce that limit unless the agreement authorizes it to do so.

The Georgia courts apparently have not addressed the issue of a lender's duty to advance funds under a line of credit, although they have recognized that a lender's failure to advance funds pursuant to a written loan agreement will support a claim for breach of contract. *See Albany Fed. Sav. & Loan Ass'n v. Henderson*, 198 Ga. 116, 139–41, 31 S.E.2d 20 (1944). A recent case by the Georgia Court of Appeals, however, seems to support the Plaintiffs' position. In *Studdard v. George D. Warthen Bank*, 207 Ga.App. 80, 80, 427 S.E.2d 58 (1993), the court held that Georgia's statute of frauds barred recovery on an oral promise to extend a line of credit:

Construing the evidence most favorably for appellants, they borrowed $40,000 from appellees pursuant to an oral extension of a $120,000 line of credit, but were subsequently denied the additional $80,000 when they sought to borrow it. However, such a commitment to lend appellants money would have to be evidenced by a writing signed by appellees. O.C.G.A. § 13–5–30(7).

(emphasis removed). Thus, it would seem that where, as here, an agreement to extend a line of credit is evidenced by a writing

---

the contract; indeed, counsel for GMAC admitted during oral argument that the pages had not been shown to Coffee and that they were only being submitted as proof of GMAC's good faith in its dealings with Plaintiffs (*i.e.*, because the Plaintiffs were treated in accordance with GMAC's standard policies). My point, however, is that even if I were to consider Exhibit 5 as part of the parties' agreement, it does not lend support to GMAC's argument that its duty to advance funds on LMC's behalf was discretionary.

**14.** GMAC also cites *Grandin Indus. v. Florida Nat'l Bank,* 267 So.2d 26 (Fla.Dist.Ct.App.1972)

in support of its contention. *Grandin Indus.* is inapposite, however, as the contract in that case clearly committed the lending decision to the bank's discretion. *See id.* at 27–28.

**15.** I note, however, that the *Midlantic Nat'l Bank* definition is adopted in 9 C.J.S. *Banks & Banking* § 463 (1996). *See id.* ("A line of credit does not constitute an agreement imposing upon the bank a duty to loan up to the limit or imposing upon the borrower a duty to borrow up to the limit.") (citing *Midlantic Nat'l Bank*).

signed by the lender, the Georgia courts would enforce that agreement.[16]

■ Moreover, I do not believe that the Georgia courts would adopt the *Midlantic Nat'l Bank* definition of a line of credit, at least insofar as that case may be read to hold that merely designating an arrangement as a line of credit makes the lender's obligation discretionary as a matter of law.[17] Indeed, while the term "line of credit" frequently may be used in reference to an arrangement in which the lender is authorized to adjust the debtor's credit limit as the lender sees fit, the lender's authority to do so is derived not from the terminology used to classify the particular arrangement, but rather from the language of the contract itself.[18] In other words, designating a particular lending arrangement as a line of credit does not, by itself, qualify the lender's obligation to advance funds when that obligation is otherwise plainly stated in the contract.

Under the express terms of the written agreement in this case, GMAC extended a line of credit to LMC in the amount of $1.5 million. GMAC did not have authority under the agreement to adjust the line of credit based upon the number of vehicles financed or upon any other criteria. There is nothing ambiguous about this aspect of the agreement. If GMAC had wished to retain discretion over the lending decision it easily could have inserted language to that effect in the form contract.[19] GMAC was unconditionally obligated to advance up to $1.5 million on LMC's behalf for the purchase of vehicles, and thus it would appear that GMAC's failure to advance funds, or its conditioning funds upon the satisfaction of extra-contractual requirements, constituted a breach of this agreement. Nevertheless, it would be premature to grant summary judgment in favor of Plaintiffs on this issue, as there may have been a modification of the agreement.

GMAC's modification argument, which I must observe is not clearly articulated in its various briefs, is apparently as follows: GMAC had the authority to terminate the

16. This assumes, of course, the existence of an otherwise enforceable agreement. I recognize that the court in *Studdard* referred to a "commitment" to loan money, which some courts, including the court in *Midlantic Nat'l Bank*, have indicated requires separate consideration (*i.e.*, other than a return promise to pay interest on the borrowed funds). *See Midlantic Nat'l Bank*, 386 So.2d at 33 n. 1 ("[I]t is useful for banks to distinguish lines of credit from commitments.... A commitment ... is defined as an agreement signed by both borrower and lender for a specified amount and for a definite period not to be canceled except under the conditions set forth in the agreement. Every commitment must have a stated expiration date. *For this assurance of credit availability, the bank's customer pays a fee.*") (quoting Bank Administration Institute, Bank Administration Volume I) (emphasis supplied); *see also Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 n. 4 (8th Cir.1991) ("A commitment fee is often viewed as consideration for an irrevocable line of credit.") (citing *Shaughnessy v. Mark Twain State Bank*, 715 S.W.2d 944, 954 (Mo.Ct.App.1986)).

It is undisputed that no commitment fee was paid upon execution of the various agreements in this case. Although GMAC purports to distinguish some of Plaintiffs' case law on the grounds that the loans involved allegedly were commitments, GMAC refers the court to no Georgia cases which indicate that a commitment to loan money must be supported by separate consideration. The court in *Studdard* made no indication that such a requirement exists, and the parties have not directly addressed the issue. Moreover, GMAC does not seem to argue that its agreement with LMC was unenforceable for lack of consideration. Therefore, I decline to address this issue at this time.

17. I note that *Midlantic Nat'l Bank* does not necessarily sweep as broadly as GMAC contends. Indeed, the court in that case appears to have been more concerned with the lender's right to terminate the agreement altogether than with the lender's right to adjust the borrower's credit limit and thereby restrict the availability of funds. *See* 386 So.2d at 33 & n. 1

18. *Cf.* Grant S. Nelson & Dale A. Whitman, *Rethinking Future Advance Mortgages: A Brief for the Restatement Approach*, 44 Duke L.J. 657, 671 (1995) ("[I]n principle the lender is obligated [under a line of credit] to permit the drawing of funds up to the agreed ceiling, making the advances obligatory. However, the applicable loan documents may impose conditions on the lender's duty, and if those conditions are not met the lender can cut off further draws on the loan.").

19. Indeed, I must pause briefly to marvel at the simplicity of the contract documents in this case. The core contract documents—the Promissory Note, the Loan Agreement, and the Wholesale Security Agreement—are each less than one page in length. There appears to be less documentation governing this $1.5 million line of credit than would be required for the credit purchase of one vehicle from LMC.

agreement at any time; thus, when GMAC reduced LMC's credit limit and imposed conditions upon the extension of further credit, it implicitly agreed to forego its right to terminate the line of credit in exchange for Plaintiffs' acceptance of the new terms.[20] Therefore, GMAC argues, the parties modified their original agreement and GMAC is not liable for breach.

■ Under Georgia law, a written agreement may be modified by a subsequent parol agreement between the parties, provided the modification is supported by consideration. *Ryder Truck Lines, Inc. v. Scott,* 129 Ga.App. 871, 873, 201 S.E.2d 672 (1973). The parties must mutually consent to the modification, "which need not be expressed in words, in writing or signed, but the parties must manifest their intent to modify the original contract." *Id.* at 873–74, 201 S.E.2d 672; *see also Dan Gurney Indus., Inc. v. Southeastern Wheels, Inc.,* 168 Ga.App. 504, 505, 308 S.E.2d 637 (1983). Whether a modification has occurred is generally a factual question to be determined by the jury. *See Norair Eng'g Corp. v. Porter Trucking Co.,* 163 Ga.App. 780, 784, 295 S.E.2d 155 (1982).

■ In this case, the issue of whether there could have been a valid modification depends at the outset on whether GMAC had the power to terminate the agreement; for unless GMAC was within its rights to terminate the agreement, its forbearance from doing so would not be sufficient consideration to support the alleged modification. *See Owings v. Georgia R.R. Bank & Trust Co.,* 188 Ga.App. 265, 266, 372 S.E.2d 825 (1988) ("An agreement on the part of one to do what he is already legally bound to do is not a sufficient consideration for the promise of another.") (citations omitted). There are two ways in which GMAC conceivably could have had the authority to terminate the agreement: (1) the agreement was terminable at will, or (2) one of the events specified in paragraph 3 of the Loan Agreement occurred, thereby triggering GMAC's termination rights.

**20.** This contention was clarified somewhat at oral argument by counsel for GMAC:
> [I]f you have a demand note we [GMAC] can call this note at any time. However, if you [Plaintiffs] will agree [to the new conditions]

■ Under Georgia law, an agreement without a fixed term of duration is terminable at the will of either contracting party. *Atakpa v. Perimeter OB–GYN Assocs.,* 912 F.Supp. 1566, 1579 (N.D.Ga.1994); *see also Voyles v. Sasser,* 221 Ga.App. 305, 305, 472 S.E.2d 80 (1996). Because none of the relevant documents contained an expiration date, GMAC contends that the agreement was terminable at will. Furthermore, GMAC notes, the Promissory Note and the Wholesale Security Agreement both stated that LMC was to repay GMAC upon demand. Because in Georgia a demand instrument may be called "at anytime with or without reason," *Fulton Nat'l Bank v. Willis Denney Ford, Inc.,* 154 Ga.App. 846, 849, 269 S.E.2d 916 (1980), GMAC argues that it could demand payment at any time.

Plaintiffs concede that the contract documents contained no expiration date; nevertheless, they contend that the enumeration of events of default in paragraph 3 of the Loan Agreement limited GMAC's right to terminate the agreement. Plaintiffs point to two cases in which courts faced with similar contractual arrangements held that the lender did not have the right to terminate the agreement and demand payment in the absence of the occurrence of one or more of the enumerated contingencies. Plaintiffs first cite *Reid v. Key Bank,* 821 F.2d 9, 14 (1st Cir.1987), in which the court reasoned as follows:

> It would be illogical to construe an agreement, providing for repayment or default in the event of certain contingencies, as permitting the creditor, in the absence of the occurrence of those contingencies, to terminate the agreement without any cause whatsoever. Under such a construction, the enumerated contingencies would be rendered meaningless.

Similarly, the Fifth Circuit held in *Bank One, Tex., N.A. v. Taylor,* 970 F.2d 16, 31 (5th Cir.1992):

> we won't demand it. Then [there is] a reasonable business relationship where somebody could decide whether they wanted to go forward in that relationship or not.
> (Tr. at 25).

[T]he existence of explicit conditions of default in the acceleration clause, as well as the related security agreements, shows a clear intention that the note be payable on demand only in the event [the borrower] failed to meet the installment obligations or the obligations imposed by the security agreements.

The *Bank One* court found the Reid decision persuasive, noting that "[i]f a demand obligation was indeed intended, ... the conditions for acceleration ... would be meaningless." *Id.*

 Plaintiffs argue that the agreement in this case, like the agreements at issue in *Reid* and *Bank One,* limited GMAC's right to terminate the agreement and demand payment at any time. I find this argument compelling under the undisputed facts of this case. Georgia law requires that a contract should, if possible, be interpreted in a way that gives effect to all of its provisions, *see* O.C.G.A. § 13–2–2(4); *McCann,* 199 Ga. at 674, 34 S.E.2d 839, and a court should avoid a construction that renders any portion of the contract meaningless. *Board of Regents v. A.B. & E., Inc.,* 182 Ga.App. 671, 675, 357 S.E.2d 100 (1987). Paragraph 3 of the Loan Agreement expressly states that GMAC "may, at its option, terminate the line of credit and refuse to advance funds hereunder upon the occurrence of any of the following" events. If the parties' agreement is construed to be terminable at will, the enumeration of these contingencies would be rendered meaningless.[21]

Furthermore, interpreting this provision as circumscribing GMAC's termination rights is not necessarily inconsistent with the demand provisions of the agreement. The Wholesale Security Agreement specifies in pertinent part that "[LMC] agree[s] upon demand to pay to GMAC the amount it advances or is obligated to advance ... for each vehicle with interest at the rate per annum designated by GMAC." Thus, while GMAC was entitled to demand payment of the *advances* it had made pursuant to the line of credit at any time, it could not *terminate* the line of credit in the absence of one of the specific events of default enumerated in paragraph 3 of the Loan Agreement.

GMAC cites two cases for the proposition that merely enumerating events of default does not limit a contracting party's rights to terminate a terminable-at-will contract. First, GMAC refers to *Mirax Chemical Prods. Corp. v. First Interstate Commercial Corp.,* 950 F.2d 566, 569 (8th Cir.1991), in which the court stated:

A listing of events which constitute default is not necessarily incompatible with a terminable at will contract. The section of the contract dealing with default grants [the lender] additional, extra-judicial remedies on the occurrence of default. This adds to [the lender]'s rights, but does nothing to alter the fact that the agreement is terminable at will.

(footnote omitted). In the case *sub judice,* however, the enumerated contingencies do not trigger extra-judicial remedies; rather, they simply permit GMAC to "terminate the line of credit and refuse to advance funds." (Loan Agreement ¶ 3). Moreover, the Wholesale Security Agreement specifies events of default which permit GMAC to take immediate possession of LMC's vehicles without legal process. The inclusion of these provisions in the Wholesale Security Agreement bolsters the conclusion that the reasoning of *Mirax Chemical* is inapplicable to the facts of this case.

---

**21.** In its opposition brief, GMAC advances the argument that the events listed in paragraph 3 of the Loan Agreement are merely illustrative and did not restrict GMAC's right to terminate the line of credit at any time. (Br. in Opp. to Pls.' Mot. for Partial Summ. J. at 15–16). This argument is wholly without merit. There is no language in the Loan Agreement indicating that the listed contingencies are only exemplary. Indeed, the case cited by GMAC in support of this argument, *Levetan v. Lanier Worldwide,* 265 Ga. 323, 324, 454 S.E.2d 504 (1995), simply held that a statutory provision allowing certain property to be excluded from ad valorem taxes, "*including* all such taxes levied for educational purposes and for state purposes," enlarged rather than restricted the scope of the statute. (emphasis supplied); *see also American Sur. Co. v. Marotta,* 287 U.S. 513, 517, 53 S.Ct. 260, 77 L.Ed. 466 (1933) (noting that " 'include' is frequently, if not generally, used as word of extension or enlargement rather than as one of limitation or enumeration").

Second, GMAC cites *Trient Partners I, Ltd. v. Blockbuster Entertainment Corp.*, 83 F.3d 704, 709 (5th Cir.1996), in which the court held that the termination contingencies at issue—(1) an incurable default by either party, (2) the death or incapacity of a partner, (3) a transfer of ownership without approval, and (4) the insolvency of either party—did not transform a contract of indefinite duration into one of definite duration. However, the court also was careful to note that the parties' agreement expressly stated that it would continue indefinitely:

> We will not hold that a contract is definite in duration when it (1) expressly states that it will "continue indefinitely," *and* (2) is confined in time only by "termination provisions" which contain conditions that are likely never to transpire.

*Id.* (footnote omitted). Here, there is no provision expressly stating that the agreement will continue indefinitely, and, more importantly, the events of default enumerated in the Loan Agreement are more concrete and determinable than the contingencies described in *Trient Partners.* Thus, *Trient Partners* is distinguishable from the present case.

I note that the Georgia courts have apparently not addressed the issue of whether one party's ability to terminate a contract of indefinite duration is circumscribed by the enumeration of events of default. The parties have not referred the Court to any Georgia cases,[22] nor has the Court located any in its own research. However, the logic of *Reid* and *Bank One,* as well as a common-sense construction of the parties' agreement, compels the conclusion that GMAC could terminate the line of credit only upon the occurrence one or more of the specified contingencies.

Plaintiffs assert that it is undisputed that none of these events occurred. GMAC, however, claims that one of the enumerated contingencies did in fact occur and that therefore there is a genuine issue of material fact which precludes summary judgment. Specifically, GMAC contends that Coffee failed to comply with a separate agreement that the dealership's capitalization would be maintained in accordance with GMAC's guidelines. Paragraph 3 of the Loan Agreement does state that GMAC may terminate the line of credit upon "a default by [LMC] in the payment or performance of any obligation hereunder *or under any other agreement entered into with [GMAC].*" (emphasis supplied). GMAC asserts that LMC was inadequately capitalized from the outset, and thus it contends that it was within its rights to terminate the agreement and refuse to advance funds.

First, I note that GMAC bears the burden of proving that one of these contingencies occurred. *See* 3A Arthur L. Corbin, *Corbin on Contracts* § 749 (1960). In support of its contention, GMAC refers to various internal documents which purportedly show the existence of that separate agreement. Although these documents are not persuasive by themselves, they nevertheless demonstrate the potential of an inference that Coffee agreed to keep LMC capitalized in accordance with GMAC's requirements.[23] Moreover, Plaintiffs did not respond to GMAC's argument that one of the identified contingencies occurred, and therefore I will deem this issue conceded, albeit only for purposes of this Order.

In summary, GMAC was obligated under the terms of the written agreement to advance up to $1.5 million on LMC's behalf for

---

**22.** Plaintiffs do cite *Orkin Exterminating, Inc. v. F.T.C.*, 849 F.2d 1354, 1361 n. 7 (11th Cir.1988), in which the Eleventh Circuit stated that although contracts of indefinite duration are generally terminable at will, "[t]his rule does not apply ... to cases in which the disputed agreement provides for termination or cancellation upon the occurrence of a specified event." Although it is not clear which state's law the court was applying in that case, it is worth noting that the Eleventh Circuit has recognized this principle.

**23.** GMAC did not address the fact that paragraph 3 of the Loan Agreement refers to agreements between "Debtor" (LMC) and "Secured Party" (GMAC). Nevertheless, it appears that under the circumstances of this case GMAC could raise Coffee's failure to abide by the alleged separate agreement as giving rise to its authority to terminate the line of credit. *See Berger v. Mercantile Nat'l Bank*, 231 Ga. 680, 680, 203 S.E.2d 479 (1974). By a similar rationale, I conclude that Coffee has standing to assert a claim against GMAC for its alleged breach of contract. *See id.*

its inventory purchases. GMAC had no authority under this agreement to adjust LMC's line of credit or otherwise restrict the availability of funds, and GMAC could not terminate the line of credit in the absence of one of the contingencies identified in paragraph 3 of the Loan Agreement. Nevertheless, a genuine issue of fact remains · as to whether one of these contingencies occurred, and therefore there is a genuine issue of fact as to whether the parties modified their agreement. Accordingly, summary judgment is not appropriate for either Plaintiffs or GMAC on the breach of contract claim.

## B. Automobile Dealers' Day in Court Act

The Automobile Dealers' Day in Court Act (ADDCA), 15 U.S.C. §§ 1221–25, "is a remedial statute enacted to redress the economic imbalance and unequal bargaining power between large automobile manufacturers and local dealerships, protecting dealers from unfair termination and other retaliatory and coercive practices." *Maschio v. Prestige Motors*, 37 F.3d 908, 910 (3rd Cir.1994). The statute permits an "automobile dealer" to bring suit against an "automobile manufacturer" [24] for "the failure of said automobile manufacturer ... to act in good faith in performing or complying with any of the terms of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer." 15 U.S.C. § 1222.

■ GMAC first argues that Coffee lacks standing to sue in his individual capacity under the ADDCA because he is not an "automobile dealer" within the meaning of the Act. *See* 15 U.S.C. § 1221(c) (defining "automobile dealer" for purposes of ADDCA); *Sherman v. British Leyland Motors, Ltd.*, 601 F.2d 429, 439 (9th Cir.1979) (holding that president and sole shareholder of dealership lacked standing under ADDCA).

Plaintiffs, on the other hand, argue that Coffee has standing to assert an ADDCA claim because he was "inextricably woven" into the franchise agreement between GM and LMC. *See York Chrysler–Plymouth, Inc. v. Chrysler Credit Corp.*, 447 F.2d 786, 790 (5th Cir. 1971) (holding that shareholders "were so inextricably woven into" franchise agreement that they could assert ADDCA claim).[25] The Eleventh Circuit, however, recently distinguished *York Chrysler–Plymouth*, emphasizing that "individuals [do] not come within the scope of the [ADDCA] merely because they were the sole stockholders, officers, and directors of the corporate franchise holder." *Pearson v. Ford Motor Co.*, 68 F.3d 1301, 1303 (11th Cir.1995) (per curiam) (quoting *York Chrysler–Plymouth*, 447 F.2d at 790). Rather, an individual shareholder has standing only when he has been "made ... essential to the operation of the dealership." *Id.; see also York Chrysler–Plymouth*, 447 F.2d at 790 ("We believe that [plaintiffs] were made essential to operation of the dealership by the agreement with [defendant].").

I find that the facts of the present case are more analogous to *York Chrysler–Plymouth* than to *Pearson*. Indeed, it is readily apparent from the various agreements between LMC and GM that Coffee was considered essential to the dealership's operations. (*See* Coffee Supp. Aff., Ex. A). Moreover, Coffee had personally guaranteed LMC's indebtedness to GMAC, and thus his personal wealth was substantially intertwined with the dealership's financial affairs. Therefore, I conclude that Coffee has standing to assert a claim under the ADDCA.

■ Second, GMAC argues that it is entitled to summary judgment on Plaintiffs' ADDCA claim because Plaintiffs cannot show that GMAC failed to act in good faith.

---

**24.** GMAC has conceded that, for summary judgment purposes, an issue of fact exists as to whether it may be liable as an "automobile manufacturer" under the ADDCA. *See Stamps v. Ford Motor Co.*, 650 F.Supp. 390, 396 (N.D.Ga. 1986) ("[U]nder standard agency principles, if a defendant is an agent of the manufacturer, its actions are cognizable under the ADDCA even though it may be a stranger to the franchise agreement."); *see also General Motors Acceptance Corp. v. Marlar*, 761 F.2d 1517, 1521 (hold-

ing that evidence supported jury verdict that defendant was agent of manufacturer), *vacated*, 774 F.2d 1042 (11th Cir.1985) (vacating opinion because of prior settlement).

**25.** In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all former Fifth Circuit cases decided prior to the close of business on September 30, 1981.

"Good faith" has a specialized definition under the ADDCA:

> The term "good faith" shall mean the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided,* That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.

15 U.S.C. § 1221(e). "Bad faith under [the ADDCA] has been defined narrowly and construed strictly. It does not mean simply a lack of fairness but entails a showing of coercion." *Carroll Kenworth Truck Sales, Inc. v. Kenworth Truck Co.,* 781 F.2d 1520, 1525 (11th Cir.1986) (citations omitted). However, if the defendant had an objectively valid reason for its actions, the plaintiff cannot prevail absent evidence of an ulterior motive. *Stamps v. Ford Motor Co.,* 650 F.Supp. 390, 397 (N.D.Ga.1986) (citing *Carroll Kenworth Truck Sales,* 781 F.2d at 1527 & n. 4).

GMAC contends that because it has put forward evidence tending to show that it acted out of concern over LMC's financial difficulties, it has shown that it had objectively valid reasons for its conduct. Thus, GMAC argues, Plaintiffs were required to present evidence of an ulterior motive to avoid summary judgment. Because Plaintiffs have not come forward with any such evidence,[26] GMAC contends that it is entitled to summary judgment on the Plaintiffs' ADDCA claim.

■ Plaintiffs, on the other hand, vigorously contend that they are required to show evidence of an ulterior motive only if GMAC's conduct was contractually authorized. That is, Plaintiffs argue that GMAC's conduct was "objectively valid" within the meaning of *Stamps* only if it was authorized

by the contract. Plaintiffs cite three cases for this proposition: *Carroll Kenworth Truck Sales,* 781 F.2d at 1527; *Victory Motors v. Chrysler Motors Corp.,* 357 F.2d 429, 432 (5th Cir.1966); and *Stamps,* 650 F.Supp. at 397. It is true, as Plaintiffs note, that the manufacturer's conduct in these cases was contractually authorized; however, nothing in the courts' opinions limits the universe of "objectively valid" reasons to those authorized by the parties' agreement. Although the terms of the contract are certainly relevant to the issue of GMAC's good faith or lack thereof, contractual authorization is not the *sine qua non* of good faith under the ADDCA. *See In re American Honda Motor Co. Dealerships Relations Litig.,* 941 F.Supp. 528, 566 (D.Md.1996) ("[Good faith under the ADDCA] does not mean simple unfairness or breach of a franchise agreement, but rather actual or threatened coercion or intimidation imposed upon the dealer by the manufacturer.") (internal quotation marks and citation omitted); *see also* 62B Am.Jur.2d *Private Franchise Contracts* §§ 579–87 (1990).

■ Nevertheless, Plaintiffs were not required to submit evidence of an ulterior motive simply because GMAC pointed to evidence of a purportedly objective justification for its conduct. "[W]hether a manufacturer has acted with sufficient justification to constitute good faith in bringing pressure to bear on a dealer is a factual question which will depend on the circumstances arising in each particular case." *H.C. Blackwell Co. v. Kenworth Truck Co.,* 620 F.2d 104, 107 (5th Cir.1980) (quoting *Rea v. Ford Motor Co.,* 497 F.2d 577, 585 (3rd Cir.1974)). It is only if the manufacturer's conduct is justified as a matter of law that the dealer must present evidence of an ulterior motive to show that the manufacturer acted in bad faith. *See Stamps,* 650 F.Supp. at 397 ("[T]his case strongly resembles cases in which objectively valid criteria justified a manufacturer's actions as a matter of law.") (citing *Carroll Kenworth Truck Sales,* 781 F.2d at 1528, and

---

**26.** Plaintiffs did identify an alleged ulterior motive in response to GMAC's arguments—namely, that GMAC desired to induce Coffee to rescue the financially troubled Hilliard dealership and then force Coffee out and replace him with a "car man." Because I conclude that there is a jury question as to whether GMAC had objectively valid reasons for its actions, I need not address whether Plaintiffs' evidence of this alleged ulterior motive is sufficient to survive summary judgment.

*Quarles v. General Motors Corp.*, 758 F.2d 839 (2d Cir.1985)).

Here, there is evidence in the Record that GMAC had legitimate concerns about LMC's performance and that GMAC treated LMC like other financially troubled dealerships. There is some evidence, however, that GMAC acted in a coercive and intimidating manner in its dealings with the Plaintiffs. Also, it is notably undisputed that Plaintiffs timely met all financial obligations under their agreements with GMAC. At this stage in the litigation, it remains a jury question whether GMAC acted with the requisite bad faith. Accordingly, GMAC's Motion for Summary Judgment is denied on Plaintiffs' ADDCA claim.

**C. *Georgia Motor Vehicle Franchise Practices Act***

The Georgia Motor Vehicle Franchise Practices Act (MVFPA), O.C.G.A. §§ 10–1–620 to –668, and in particular the Georgia Motor Vehicle Dealer's Day in Court Act (GDDCA), O.C.G.A. §§ 10–1–630 to –631, is the state-law counterpart to the ADDCA. "[A]ny person who is or may be injured by a violation of a provision of" the MVFPA may bring an action for damages, which may include punitive damages in some circumstances. O.C.G.A. § 10–1–623(a), (b). In general terms, O.C.G.A. § 10–1–631 makes it unlawful for a "franchisor" to fail to act in good faith in its relationship with a motor vehicle dealer. A "franchisor" is defined as follows:

(A) Any person, resident or nonresident, who directly or indirectly licenses or otherwise authorizes one or more dealers to use a trademark or service mark associated with a make of motor vehicle in connection with the retail sale of new motor vehicles bearing such trademark or service mark; and

(B) Any person who in the ordinary course of business and on a recurring basis sells such new motor vehicles to a dealer for resale.

O.C.G.A. § 10–1–622(7).

The Georgia Court of Appeals recently emphasized that liability under the GDDCA extends only to a "franchisor" as defined in O.C.G.A. § 10–1–622(7). *Nissan Motor Acceptance Corp. v. Stovall Nissan, Inc.*, 224 Ga.App. 295, 300, 480 S.E.2d 322 (1997). The court concluded that the defendant, a wholly owned financing subsidiary of Nissan Motor Corporation, was not a franchisor because it had never sold vehicles to the plaintiff, nor had it ever licensed the plaintiff to sell vehicles. *Id.* Thus, the court held that the defendant could not be liable under the GDDCA. *Id.*

GMAC points out that, like the defendant in *Stovall Nissan,* it neither sold vehicles to LMC nor licensed LMC to sell those vehicles. Thus, GMAC argues, it is not a "franchisor" under O.C.G.A. § 10–1–622(7) and therefore it cannot be held liable under the GDDCA. Plaintiffs attempt to avoid the persuasive force of this argument by pointing to two statutory provisions which they contend create a conflict which must be resolved through statutory construction. First, Plaintiffs note that O.C.G.A. § 10–1–624(a) provides that

> *[a]ny person* who engages directly or indirectly in purposeful contacts within this state in connection with the offering of advertising for sale or has business dealings with respect to a new motor vehicle sale within this state *shall be subject to the provisions of this article* and shall be subject to the jurisdiction of the courts of this state.

(emphasis supplied). Second, Plaintiffs point out that O.C.G.A. § 10–1–624(d) prohibits a franchisor from using a subsidiary corporation "to accomplish what would otherwise be illegal conduct under this article."

Plaintiffs assert that these provisions would be rendered meaningless if they are not interpreted as subjecting GMAC to liability under the GDDCA. However, there is no conflict between these provisions and the GDDCA's limitation of liability to "franchisors" as defined by the statute, nor does the limitation of liability to franchisors conflict with the overall remedial purpose of the MVFPA. To the contrary, § 10–1–624(d) bolsters GMAC's contention that liability should be limited to franchisors, as the statute clearly contemplates the use of

subsidiary corporations by franchisors to avoid liability, but the term was not defined to include those subsidiaries. Furthermore, I note that § 10–1–624(a) seems to be merely jurisdictional in nature; GMAC can clearly be a "person" within the meaning of § 10–1–624(a)—and therefore subject to the broader provisions of the MVFPA—but not a "franchisor" subject to liability for a violation of the GDDCA. Plaintiffs' attempt to read a conflict into these statutory provisions is unavailing.

Finally, Plaintiffs argue that the *Stovall Nissan* case is distinguishable because the dealer in that case did not raise the arguments raised by the Plaintiffs herein. Even assuming that this distinction could make a difference when the court's opinion is otherwise on point, I have already determined that Plaintiffs' arguments are without merit, and therefore they provide no basis for distinguishing *Stovall Nissan*. I conclude that Plaintiffs cannot recover against GMAC on this claim as a matter of law, and accordingly GMAC's Motion for Summary Judgment is granted on this claim.

**D. *Fraud and Negligent Misrepresentation***

The tort of fraud has five elements under Georgia law: (1) a false representation by the defendant; (2) scienter; (3) an intention to induce the plaintiff either to act or to refrain from acting; (4) justifiable reliance by the plaintiff; and (5) damage to the plaintiff. *Cobb County Sch. Dist. v. MAT Factory, Inc.*, 215 Ga.App. 697, 700–01, 452 S.E.2d 140 (1994). The tort of negligent misrepresentation has similar elements: "(1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance." *Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas, Inc.*, 267 Ga. 424, 426, 479 S.E.2d 727 (1997). GMAC contends that it is entitled to summary judgment on these claims because Plaintiffs cannot identify any representations that GMAC failed to honor; that is, GMAC claims that Plaintiffs cannot show

that any false representations were made. Specifically, GMAC asserts that the only representation identified by the Plaintiffs is GMAC's 1990 statement that LMC's credit line would be increased if Coffee were to contribute an additional $100,000.00 to LMC's capital. Because LMC's credit limit was increased (albeit only temporarily) following Coffee's contribution, GMAC argues that summary judgment should be granted in its favor.

Plaintiffs, on the other hand, assert that at the time the parties entered into the inventory financing arrangement, GMAC represented that it would advance funds up to the maximum amount available under the line of credit and that GMAC did not intend to honor those representations. Plaintiffs' evidence in support of this assertion is slight; indeed, I have some doubt whether Plaintiffs have identified the alleged misrepresentations with sufficient particularity as to state a claim for relief. Nevertheless, given the circumstances of this case and the relatively undeveloped state of the Record at this point in the proceedings, I cannot conclude that GMAC is entitled to judgment as a matter of law on these claims.

Moreover, GMAC does not seem to challenge this aspect of Plaintiffs' allegations; rather, GMAC argues that the Plaintiffs cannot rely on these alleged misrepresentations to avoid summary judgment because their Complaint focused upon representations that GMAC allegedly made *after* the parties entered into the inventory financing arrangement. That is, GMAC contends that Plaintiffs are impermissibly changing their legal theory on these claims to avoid summary judgment. *See Seale v. Miller*, 698 F.Supp. 883, 903–04 (N.D.Ga.1988) (holding that plaintiffs could not avoid summary judgment on fraud claim by raising new allegations of fraudulent conduct). However, a fair reading of the Complaint reveals that Plaintiffs are asserting claims based upon alleged misrepresentations made "throughout the course of LMC's relationship with GMAC." (Compl.¶¶ 74, 79). Thus, Plaintiffs are not precluded from relying on misrepresentations allegedly made at the outset of that relationship.

■ GMAC also contends that Plaintiffs are estopped from claiming fraud in the inducement because they affirmed the contract and never attempted to rescind it after becoming aware of the alleged fraud. In support of this assertion, GMAC cites *Capital City Ins. Co. v. Rick Taylor Timber Co.*, 918 F.Supp. 1558, 1563–64 (S.D.Ga.1995), *aff'd mem.*, 106 F.3d 417 (11th Cir.1997). That case is inapposite, however, because it dealt with the ability of an injured party to rescind a contract because of fraud; the court did not address a party's ability to treat the contract as valid and bring a separate claim for damages caused by the alleged fraud. *See id.* Indeed, the rule in Georgia is that "[f]raud ordinarily gives the injured party the right *either* to rescind the contract, or, by affirming the same, to claim damages." *Simmons v. Weber*, 197 Ga.App. 457, 458, 398 S.E.2d 795 (1990) (quoting *Brown v. Ragsdale Motor Co.*, 65 Ga.App. 727, 730, 16 S.E.2d 176 (1941)) (emphasis supplied). GMAC's argument is contrary to this established rule of law, as it would preclude an independent tort action simply because the injured party chose to affirm the contract.

■ Finally, GMAC contends that its misrepresentations, if any, related only to future events and are therefore not actionable. *See Fuller v. Perry*, 223 Ga.App. 129, 131, 476 S.E.2d 793 (1996) ("It is axiomatic that a false representation made by a defendant, to be actionable, must relate to an existing fact or a past event."). Although GMAC concedes that representations of future events are actionable if they were made with the present intention not to perform, *see id.* at 131–32, 476 S.E.2d 793, GMAC claims that Plaintiffs have come forward with no evidence showing that the alleged representations were made with such intent. However, there is sufficient evidence in the Record from which a jury could find that GMAC did not intend to abide by the alleged representations. *See Farmers State Bank v. Huguenin*, 220 Ga.App. 657, 661, 469 S.E.2d 34 (1996) (noting rule that although fraud may not be presumed, "slight circumstances may be sufficient to" support claim). According-

ly, GMAC's Motion for Summary Judgment is denied with respect to Plaintiffs' claims for fraud and negligent misrepresentation.

### E. Promissory Estoppel

■ A promissory estoppel claim under Georgia law requires proof "that (1) the defendant made certain promises, (2) the defendant should have expected that the plaintiff would rely on such promises, and (3) the plaintiff did in fact rely on such promises to his detriment." *Doll v. Grand Union Co.*, 925 F.2d 1363, 1371 (11th Cir.1991). GMAC contends that it is entitled to summary judgment on Plaintiffs' promissory estoppel claim because Plaintiffs cannot identify with sufficient particularity any promises that GMAC failed to perform. *See Foley Co. v. Warren Eng'g, Inc.*, 804 F.Supp. 1540, 1544 (N.D.Ga. 1992) ("The threshold requirement of a promissory estoppel claim is, of course, that there be some enforceable promise by the defendant.") (footnote omitted). I need not address this issue, however, as Plaintiffs informed the Court in their Response Brief that this claim is being asserted only "as an alternative claim in the event that the Court finds that the Loan Documents did not require GMAC to extend a $1.5 million Line of Credit." (Pls.' Resp. to Def.'s Mot. for Summ. J. at 24 n. 25). Because I previously determined that GMAC was obligated to advance funds up to the full amount of LMC's line of credit, *see supra* Part III.A, Plaintiffs have no claim for promissory estoppel. *See Bank of Dade v. Reeves*, 257 Ga. 51, 53, 354 S.E.2d 131 (1987) (holding that "promissory estoppel is not present" where parties entered into agreement supported by consideration). Accordingly, summary judgment is granted for GMAC on Plaintiffs' promissory estoppel claim.[27]

### F. Tortious Interference

■ Finally, Plaintiffs allege that GMAC tortiously interfered with LMC's contractual and business relations with GM by canceling LMC's vehicle orders and by hav-

---

27. I note that this claim may regain its viability if the Court later addresses the issue of consideration supporting the line of credit. *See supra*

note 16. Should the Court decide that issue adversely to Plaintiffs, the Court may consider a request by Plaintiffs to revive this claim.

ing GM divert shipments to other dealers. (Compl. ¶¶ 85, 90). Interference with contractual relations and interference with business relations are two distinct but related claims under Georgia law. *Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp.*, 130 F.3d 1009, 1020 (11th Cir.1997). In order to prevail on these claims, Plaintiffs must show, *inter alia,* that GMAC was a stranger to the contractual and business relationships between GM and LMC. *See Britt/ Paulk Ins. Agency v. Vandroff Ins. Agency,* 952 F.Supp. 1575, 1584 (N.D.Ga.1996) ("Georgia law requires that a plaintiff show that the defendant is a 'stranger' to the business and contractual relations at issue in order to prevail on tortious interference with business and contractual relations claims."), *aff'd mem.,* 137 F.3d 1356 (11th Cir.1998).

GMAC argues that it was not a stranger to LMC's franchise relationship with GM because Plaintiffs alleged in their Complaint that GMAC acts as GM's agent by providing inventory financing to GM dealerships. (Compl. ¶ 57). Under Georgia law, an agent cannot tortiously interfere with its principal's contracts when acting within the scope of the agency. *See Jet Air, Inc. v. National Union Fire Ins. Co.,* 189 Ga.App. 399, 403–04, 375 S.E.2d 873 (1988); *see also Amerigas Propane, L.P. v. T–Bo Propane, Inc.,* 972 F.Supp. 685, 695 (S.D.Ga.1997). Because the actions of which Plaintiffs complain were undertaken in the course of the agency alleged by Plaintiffs, GMAC argues that it could not have tortiously interfered with the contractual or business relationships between GM and LMC.

Plaintiffs, on the other hand, argue that the Georgia Court of Appeals' opinion in *SunAmerica Financial, Inc. v. 260 Peachtree St., Inc.,* 202 Ga.App. 790, 415 S.E.2d 677 (1992), requires these claims to be submitted to a jury.[28] In that case, the court faced the question "whether in Georgia the corporate parent of a wholly-owned subsidiary or of the latter's wholly-owned subsidiaries cannot be deemed, as a matter of law, a third party capable of tortiously interfering with the contracts of said subsidiaries." *Id.* at 797, 415 S.E.2d 677. In considering this issue, the court stated:

> [W]hile the interests of a parent corporation generally will be consistent with that of a subsidiary, circumstances can arise under which these interests may differ. Accordingly, we question whether a bright-line test should be established to the effect that a parent corporation can never be held liable for tortious interference with a wholly-owned subsidiary's contract with another party. Rather, the better rule appears to be that of giving a qualified privilege to the parent corporation, permitting it to interfere with a wholly-owned subsidiary's, or the latter's wholly-owned subsidiary's, contractual relations with another party when the contract threatens a present economic interest of said subsidiary, absent clear evidence that the parent employed wrongful means or acted with improper purpose.

*Id.* at 798, 415 S.E.2d 677.

Plaintiffs argue that if a parent can interfere with its subsidiary's contracts, then a subsidiary can interfere with its parent's contracts. Thus, Plaintiffs contend, the "qualified privilege" described in *SunAmerica* should apply to this case, and because there is evidence in the Record purportedly showing that GMAC employed wrongful means

**28.** It is not clear whether, for purposes of their tortious interference claims, Plaintiffs intend to disavow their previous allegation that GMAC was acting as GM's agent. In a footnote in their Response Brief, Plaintiffs note that they "are entitled to assert a claim for tortious interference as an alternative claim." (Pls.' Resp. to Def.'s Mot. for Summ. J. at 22 n. 23). Although Plaintiffs do not elaborate on this point, the implication seems to be that Plaintiffs' tortious interference claims are not precluded simply because the Complaint contains allegations which may be inconsistent with those claims. *See* Fed.R.Civ.P. 8(e). However, Plaintiffs do not argue that GMAC was not acting as GM's agent, nor do they otherwise argue that GMAC should be considered a stranger to LMC's relationship with GM. That is, Plaintiffs seem to concede the agency relationship and instead rely on the rationale of the *SunAmerica* case. In any event, I need not decide whether Plaintiffs' agency allegations preclude recovery on their tortious interference claims: as discussed below, the question whether GMAC was a stranger to the relationship between LMC and GM depends upon the nature and extent of GMAC's interest in that relationship, not upon the existence of an agency relationship between GM and GMAC.

and acted with an improper purpose, summary judgment is inappropriate on Plaintiffs' tortious interference claims.

Despite the Plaintiffs' arguments, however, I do not believe the qualified privilege announced in *SunAmerica* should automatically be extended to cover a subsidiary's interference with its parent's contractual and business relationships. As I read *SunAmerica,* the court held that a parent corporation's ownership interest in a wholly owned subsidiary does not, by itself, shield the parent from tortious interference claims as a matter of law. The court did not abandon the rule that a defendant must be a stranger to the contractual or business relationship at issue in order to be considered a third party capable of tortious interference with that relationship; indeed, the *SunAmerica* court repeated that principle, *see* 202 Ga.App. at 798, 415 S.E.2d 677 ("[I]n Georgia, '[t]ortious interference with contractual relations is applicable only when the interference is done by one who is a stranger to the contract.' ") (quoting *Jet Air,* 189 Ga.App. at 403, 375 S.E.2d 873), and the rule has been reaffirmed in subsequent decisions. *See Barnwell v. Barnett & Co.,* 222 Ga.App. 694, 695, 476 S.E.2d 1 (1996) ("Tortious interference with contract requires proof of: (1) an independent wrongful act of interference by a stranger to the contract....").

The Georgia Court of Appeals recently explained that "[w]here appropriate circumstances appear from the evidence that a defendant had a legitimate interest in either the contract or a party to the contract, the defendant is not a stranger to the contract." *Disaster Servs., Inc. v. ERC Partnership,* 228 Ga.App. 739, 741, 492 S.E.2d 526 (1997). In such a situation, even if "the defendant is a 'non-signer of a particular contract[, it is not] a stranger to the contract itself or to the business relationship giving rise thereto and underpinning [the contract].' " *Id.* (quoting *Renden, Inc. v. Liberty Real Estate Ltd. Partnership III,* 213 Ga.App. 333, 336, 444 S.E.2d 814 (1994)). Although Georgia courts have interpreted the term "stranger" somewhat broadly in the context of tortious interference claims, they nevertheless

have held that a defendant is not a "stranger" to a contract or business relationship when: (1) the defendant is an essential entity to the purported injured relations; (2) the allegedly injured relations are inextricably a part of or dependent upon the defendant's contractual or business relations; (3) the defendant would benefit economically from the alleged injured relations; or (4) both the defendant and the plaintiff are parties to a comprehensive interwoven set of contracts or relations.

*Britt/Paulk Ins. Agency,* 952 F.Supp. at 1584.

Here, the Record is clear that GMAC had a legitimate economic interest in the contractual and business relationships between GM and LMC. The inventory financing arrangement between Plaintiffs and GMAC required GMAC to pay GM for vehicles that LMC purchased for lease or resale; LMC was in turn obligated to pay GMAC the principal amount advanced plus interest. The economic benefit of this relationship to GMAC was derived directly from LMC's franchise relationship with GM. Indeed, LMC's relationship with GM was a logical prerequisite to LMC's relationship with GMAC: but for GM's franchise relationship with LMC, LMC would have had no need to obtain inventory financing. Furthermore, GMAC's relationship with LMC was an integral part of LMC's overall relationship with GM; although LMC was not required to obtain inventory financing from GMAC, such financing was necessary for LMC to maintain its relationship with GM.

Under these circumstances, GMAC was not a stranger to LMC's contractual and business relationships with GM. GMAC was not only intertwined with LMC's relationship with GM, GMAC derived a direct economic benefit from those purportedly injured relations. Moreover, Plaintiffs have come forward with no evidence showing that GMAC was a stranger to LMC's franchise relationship with GM. *See Britt/Paulk,* 952 F.Supp. at 1584 (noting that burden is on plaintiff to show that defendant was stranger to contractual or business relationship at issue). Accordingly, GMAC's Motion for Summary

Judgment is granted with respect to Plaintiffs' claims for tortious interference with business relations and tortious interference with contractual relations.

### IV. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Partial Summary Judgment and Motion to Strike are **DENIED.** Defendant's Motion for Summary Judgment is **GRANTED** as to Plaintiffs' claim under the Georgia Motor Vehicles Franchise Practices Act (Count II), and as to Plaintiffs' claims for promissory estoppel (Count IV), tortious interference with business relations (Count VII), and tortious interference with contractual relations (Count VIII). The Clerk of the Court is directed to **ENTER FINAL JUDGMENT** in favor of Defendant and against Plaintiffs on these claims. Plaintiffs' remaining claims shall proceed to trial accordingly.