A91A2027. SUNAMERICA FINANCIAL, INC. et al. v. 260 PEACHTREE STREET, INC.
A91A2028. 260 PEACHTREE STREET, INC. v. BROAD, INC.
(415 SE2d 677)

BIRDSONG, Presiding Judge.

Broad, Inc. (Broad) is a multi-faceted financial services corporation; SunAmerica Corporation (SAC) is a wholly-owned subsidiary of Broad; SunAmerica Financial, Inc. (SAF) is a wholly-owned subsidiary of SAC. SunAmerica Financial, Inc. (SAF), formerly Sun Insurance Services, Inc. (SIS), and SunAmerica Corporation (SAC), formerly Sun Life Group of America, Inc. (SLGA), appeal the order of the superior court granting summary judgment to appellee/plaintiff 260 Peachtree Street, Inc. (Peachtree) as to Counts 1 and 3 of its first amended complaint, which sought payment of rent from SAF under the lease and payment from SAC under the guaranty of the lease, respectively, and on Count 1 of appellants/defendants' counterclaim pertaining to a claim of constructive eviction. Cross-appellant/appellee Peachtree has appealed the order of the superior court granting defendant Broad's motion to dismiss Peachtree's complaint of tortious interference against Broad. Broad has not filed a cross-appeal in this matter.

Appellee/cross-appellant Peachtree is the successor in interest to CSG Associates as lessor under the lease at issue herein. Further, Coastal States, as lessee, assigned all its right, title and interest in the lease to appellant SAF, which at that time was known as SIS. Commensurate therewith SLGA, subsequently SAC, executed an unconditional guaranty of payment and lease obligation performance on behalf of its subsidiary SIS. Additional facts concerning subject lease are contained in *Sun Ins. Svcs. v. 260 Peachtree Street*, 192 Ga. App.

482 (385 SE2d 127).

Peachtree asserts that SAF is in breach of the lease by having quit the premises and having refused to pay certain rents, and that SAC is in breach of its guarantee of SAF's lease obligations. Peachtree in its cross-appeal also argues that its claim against Broad for tortious interference did not fail to assert a claim on which relief could be granted. SAF and SAC assert inter alia that no rents were due and owing as lessee SAF was constructively evicted from the premises; it being contended that Peachtree was in violation of the lease and/or the holding of this court in *Sun Ins. Svcs.*, supra, by refusing to approve renovation for purposes of subleasing and by refusing to remove asbestos from the rented floors to allow safe renovation thereby depriving SAF of the beneficial use and enjoyment of the premises for a purpose for which it was rented.

The lease was to expire in 1996. In April 1989, lessee SAF advised its employees of its decision to move SAF operations to Los Angeles, California, due to a change in corporate business goals. In April 1990, the senior vice president and senior legal adviser of Broad, who also served as a Director of SAF, informed lessor Peachtree of SAF's intent to relocate and to vacate all of its space in the rented premises by October 1, 1990. SAF completed its move from the premises by October or November 1990, and continued to pay rent; also it continued its attempt to sublease the premises.

Attempts at subleasing were unsuccessful, and the record contains some evidence which indicates that at least one Atlanta commercial real estate broker declined to represent SAF in its subleasing efforts because inter alia there exists "virtually no chance" of subleasing a commercial premises containing asbestos when the lessor refuses to remove the same. An agent of that broker concluded that "the uncertainty revolving around the asbestos abatement or encapsulation ensures that any leasing efforts will end in failure."

Apparently SAF recognized the problem of attempting to sublease the premises, which had asbestos applied directly to structural supports and decking, as it attempted to obtain Peachtree's consent to abate all the asbestos from all 12-½ floors as those floors were being vacated. Thus, from approximately mid-April 1990 to mid-July 1990, meetings between SAF and Peachtree were held, and attorneys for SAF and Peachtree corresponded regarding this matter. SAF ultimately requested permission to renovate each of the floors as they were vacated so as to gut each floor and return it to a completely open space, as it had been advised by certain agents that this would facilitate space subleasing; SAF relying inter alia on *Sun Ins. Svcs.*, supra, in essence asserted that Peachtree was required to abate the asbestos in all requested renovation areas so as to render renovation safe.

After Peachtree refused to approve renovation and refused to

consider the question of asbestos abatement without an existing sub-tenant who presented a formal renovation plan of its own, SAF reduced a prior oral guarantee proposal to writing. In the written guarantee proposal, SAF gave assurances "(1) that any improvements by any subtenant would equal or exceed the quality of the original condition of the premises; or (2) in the event Sun was unable to sublease the space, it would improve the space to a condition equal to the original condition of the leased space prior to the termination of Sun's lease. Further . . . if the landlord is unwilling to accept Sun's assurances that it will meet the standard provided by the lease, Sun is prepared to give a bond, letter of credit, or some similar financial assurance in support of this obligation to the landlord as a condition of the landlord approving the plans. . . ."

On November 20, 1990, Peachtree sent invoices for rent owed as of December 1, 1990. On November 30, 1990, Peachtree received a letter signed by Mr. Weintrob, who is senior vice-president and senior legal advisor of Broad, and a director of SAF, stating that "as of December 1, 1990, we are withholding our rental payments under the lease because of lessor's [Peachtree's] failure to fulfill its obligations under the lease." SAF declined to pay any further rent. *Held*:

## Case No. A91A2027

In *Sun Ins. Svcs.*, supra at 483 (2), this court held that "the lease in the present case does carry an implied requirement that the landlord not refuse consent to *changes* that are of equal or greater quality than the original condition of the premises"; we also held that removal of asbestos "will certainly enhance the value of [Peachtree's] building." (Emphasis supplied.) Id. at 483. We are satisfied that SAF's renovation proposal *substantially complied* with the terms of the lease, which requires all repairs, additions, or improvements to be equal in quality to the original condition of the premises, by tendering a written offer of guaranty, bond, letter of credit, or similar financial assurance. Moreover, the lease clearly provides a right to the lessee to sublease without the lessor's consent, and it appears to be within the contemplation of the parties that various forms of renovation might have to be undertaken by the lessee to enable it to exercise its subleasing right. In this regard, we note that the lease provided that lessee shall make no "repairs, additions, or improvements" without first obtaining lessor's written consent. These terms appear to be used in their usual and common signification (see, e.g., OCGA § 13-2-2). The common definition of "repair" is very broad in scope and includes: "to remedy; make good; make up for; to repair damage; to repair a deficiency . . . to make amends for; compensate; to repair a wrong done." Webster's Encyclopedic Unabridged Dictionary of the

English Language (1989 ed.) Consequently, we concluded in *Sun Ins. Svcs.*, supra at 483, that this lease had an implied requirement not to refuse to consent to certain *"changes. . . ."* Thus, the proposed renovation by SAF, although so extensive as to require a virtual gutting of all floors, was consistent with SAF's attempt to exercise its right of subleasing, and we find the right of subleasing was one of the substantial and distinct purposes for which the lease was executed. Accordingly, we conclude Peachtree's refusal to consent to the proposed renovation was unreasonable and in violation of the above implied lease requirement. *Sun Ins. Svcs.*, supra.

Additionally, it was tacitly held in *Sun Ins. Svcs.*, supra, that the building is not in a safe condition for purposes of allowing SAF to make renovations as contemplated in the lease, unless the asbestos (at least in the area to be renovated) is removed. Id. at 483. As application for certiorari was denied in *Sun Ins. Svcs.*, supra, it is binding as precedent. Ga. Const. 1983, Art. VI, Sec. V, Par. III. We find the lessee's proposed renovations, initiated in support of lessee's exercise of its right of sublease, were not beyond the broad type of repairs, additions, or improvements contemplated in the lease, which were limited as to physical nature only by the requirement of the lease that any changes ultimately be of equal or greater quality than the original condition of the premises.

2. There remains, however, the issue of whether Peachtree's refusal to remove asbestos from the premises constitutes a constructive eviction thereby relieving SAF of its obligation to pay rent. The trial court concluded that a constructive eviction had not occurred in this case.

(a) On summary judgment, movant has the burden of showing the nonexistence of any material fact and that he is entitled to a judgment as a matter of law. In ruling on a motion for summary judgment, the opposing party should be given the benefit of all reasonable doubt, and the court should construe the evidence *and all inferences and conclusions* arising therefrom most favorably toward the party opposing the motion. See, e.g., *Moore v. Goldome Credit Corp.*, 187 Ga. App. 594, 595-596 (370 SE2d 843). Moreover, movant has this burden even as to issues upon which the opposing party would have the trial burden. *D. H. Overmyer Co. v. Joe Summers &c. Co.*, 120 Ga. App. 188, 189 (169 SE2d 821).

(b) In a classic constructive eviction situation, concerning commercial leases, the landlord as a consequence of his failure to keep the rented premises repaired, allows the premises to become an unfit place for the tenant, who is physically occupying the premises, to carry on the business (or purpose) for which the premises was rented, and the premises cannot be restored to a fit condition by ordinary repairs which can be made without unreasonable interruption of the

tenant's business. *Overstreet v. Rhodes*, 212 Ga. 521, 523 (93 SE2d 715); *Piano &c. Center v. Southland &c.*, 139 Ga. App. 480 (2) (228 SE2d 615). However, constructive eviction can occur under circumstances other than when the premises have been allowed to *deteriorate* to the point of unfitness. See generally *Hathaway v. Gorfine*, 134 Ga. App. 748 (216 SE2d 338) (landlord's failure to *provide* a tenantable premises for defendant to carry out his business apparently gave tenant just cause to vacate the shopping center thereby relinquishing his lease rights); *Magnolia Warehouses v. Morton &c. Co.*, 102 Ga. App. 697, 698 (2) (117 SE2d 552) (failure of landlord to begin improvement alterations timely to elevator locking system which was essential to use of premises and threatened padlocking thereof constituted constructive eviction); see *Roberson v. Allen*, 7 Ga. App. 142 (66 SE 542) (landlord's conduct in taking away a part of the rented premises and interfering with tenant's use and enjoyment of a part of the same amounted to a constructive eviction). Of course, it must be factually established that the tenants use and enjoyment of the premises is not merely rendered "uncomfortable." See *Thirsk v. Coldwell Banker &c.*, 172 Ga. App. 236, 237 (322 SE2d 544); cf. *Alston v. Ga. Credit Counsel*, 140 Ga. App. 784, 785 (1) (232 SE2d 134).

The trial court, after citing the test for constructive eviction in classic commercial lease situations involving premise deterioration, held inter alia that "[t]raditionally, in order for constructive eviction to be a defense to a suit for rent, the landlord's actions must in effect force the tenant to abandon the premises because it can no longer be used for the purposes for which it was rented." In this regard, the trial court found that SAF moved out of the premises due to its own administrative consolidation, and concluded that after SAF vacated the premises there was no tenant to evict.

We have held that "[t]o constitute an eviction which will operate as a suspension of rent, there must be either an actual expulsion of the tenant, or some act of a grave and permanent character done by the *landlord* with the intention of depriving the tenant of the *enjoyment* of the demised premises." (Second emphasis supplied.) *Potts-Thompson &c. Co. v. Capital City &c. Co.*, 137 Ga. 648 (2) (74 SE 279); *Rains Investment Co. v. George Roe &c. Assoc.*, 140 Ga. App. 566, 567 (231 SE2d 460). Normally, the questions of whether an act is permanent and grave in character or whether the act was done with the requisite intent are questions of fact for the jury. (An act may be considered grave in character if it renders the premises untenantable or unfit for the use and benefit of the tenant in accomplishing one or more of the substantial purposes of the lease (in this instance either premises rental or sublease by SAF).) "There is clearly an eviction if the landlord forcibly dispossesses the tenant, or if the lessor prevents the tenant from re-entering during an absence. But direct deprivation

is not required for an eviction. Any act [of a grave and permanent character] which so affects the tenant's enjoyment of the premises that it results in his *relinquishment* of them may amount to a constructive eviction." (Emphasis supplied.) 19 EGL (1981 Rev.), Landlord & Tenant, § 41. Moreover, the lease does not contain any covenant or condition requiring SAF to physically occupy the rented premises. Thus, if SAF's act of moving from the premises was, in fact, accomplished as a matter of administrative consolidation for business purposes, such act would not per se constitute a breach or repudiation of the lease, or a waiver of any rights or obligations thereunder. Compare *Jaffe-Spindler Co. v. Genesco, Inc.*, 747 F2d 253, 255-256 (USCA 4th Cir.). And, if SAF continued to pay rent after it moved out of the premises and did not repudiate the lease agreement, it would remain a legitimate tenant and would remain able to exercise its right of subleasing.

There exists evidence in the record that throughout the period during which SAF was moving from the premises it continued to pay rent in accordance with the terms of the lease; and, Peachtree's claims notwithstanding, there exists some evidence, either directly establishing or from which it can reasonably be inferred, that SAF attempted to sublet the premises in accordance with its rights under the lease, but was unsuccessful in its attempt due (in substantial part) to the presence of asbestos. There also exists some evidence that SAF elected not to pay rent only after Peachtree had declined to consent to the proposed renovations and had declined to abate the asbestos in the proposed renovation areas. Thus, a genuine issue of fact exists whether SAF ultimately relinquished its right of use and enjoyment of the premises (which under this lease also includes the right of use and enjoyment of the premises for purposes of subleasing) as a result of the conduct of Peachtree, or whether SAF ultimately relinquished its lease rights as a result of its own business decisions.

The trial court concluded inter alia that the duty to remove asbestos would arise only when remodeling was started, because it was only when remodeling was started that the asbestos presented a health problem; and that Peachtree's refusal to abate the asbestos until SAF found a subtenant who insists on remodeling does not deprive SAF of the beneficial use and enjoyment of the premises for the purpose for which it was rented, that is, as office space. In view of our holding in Division 1 above, we find that the unreasonable refusal of Peachtree to consent to the renovation and its inextricably connected refusal to abate the asbestos until SAF found a subtenant who insisted on remodeling, did not shield Peachtree from acquiring a legal obligation to remove the offending substance. This obligation arose immediately upon its unreasonable refusal to consent. To allow Peachtree to refuse to consent to renovation in violation of the "im-

plied requirements" of the lease and avoid acquiring an obligation to remove asbestos, merely because the unreasonably prohibited remodeling had not in fact commenced, would also enable Peachtree to circumvent the precedent and intent of our holding in *Sun Ins. Svcs.*, supra. We further find that by its unreasonable refusal Peachtree did deprive SAF of the beneficial use and benefit of the premises for the purpose of subleasing. Examining the lease on its four corners (see generally OCGA § 13-2-3), we find that in addition to the right of renting the subject *commercial* premises, the right of subleasing such premises also was one of the significant purposes for which the lease was entered by SAF. However, whether Peachtree acted with the *intention* to deprive SAF of its right of use and enjoyment of the premises for purposes of subleasing, within the meaning of *Potts-Thompson &c. Co.*, supra, creates a genuine issue of material fact, as does the question of whether the landlord's conduct merely rendered the tenant's use of the premises (for purposes of subleasing) "uncomfortable" rather than unfit for use and enjoyment for such purpose.

None of appellee's citations and arguments is found persuasive as to the disposition of this case, and *Alston v. Ga. Credit Corp.*, supra, which is factually distinguishable, is found not to be controlling.

The trial court erred in granting Peachtree's motion for summary judgment as to Counts 1 and 3 of the complaint, as amended, and as to Count 1 of defendants' counterclaim.

### Case No. A91A2028

3. Cross-appellant Peachtree asserts the trial court erred in granting Broad's motion to dismiss for failure to state a claim on the theory that a parent corporation cannot tortiously interfere with a contract between its subsidiary's subsidiary and another. The theory of cross-appellant's tortious interference claim against Broad was that the latter tortiously interfered with the rental contract when Broad halted the rental payments asserted to be due and owing from SAF to Peachtree.

(a) Initially we observe that the trial court ruled it had personal jurisdiction over Broad under both the Georgia Long Arm Statute and the "minimum contacts" test. Broad has attempted in its cross-appellee's brief to argue the validity of this ruling. This issue, however, is not before this court on appellate review, as Broad filed no notice of appeal in this case and did not initiate a cross-appeal in which this matter was properly and timely enumerated as error.

(b) The trial court found as fact that Broad is the sole shareholder and wholly owns SAC, and that in turn SAC is the sole shareholder and wholly owns SAF. This finding is supported and not controverted by evidence of record. Further, uncontroverted evidence of

record reveals that Mr. Weintrob, senior vice-president and senior legal officer of Broad and also a director of SAF, was the person who gave the instructions to both the controller of Broad and to the controller of various Broad facilities that SAF was no longer to pay rent to Peachtree. The court expressly found that notwithstanding the *affidavit* of Weintrob, showing that Broad, SAC, and SAF are separate legal entities with separate financial records and bank accounts and with their own boards of directors, "the reality is that Broad controls the movements of the two subsidiaries by controlling 100% of the stock in [SAC] which owns 100% of the stock in [SAF]. . . . [T]he parent may assert full control any moment the subsidiary fails to act in the parent's best interest." We are satisfied that the mere fact Broad may be a separate legal entity would not prevent it from having the power to control its wholly-owned subsidiary and the latter's wholly-owned subsidiary. Interestingly, the record established that Mr. Saltzman who is Executive Vice-President of Broad also is the President of SAC and a member of SAC's board of directors, and a member of the board of directors of SAF; however, Mr. Saltzman could not recall the other officers of SAC, although he could recall readily the senior officers and directors of Broad. Saltzman further testified in his deposition that there are no formal meetings of the boards of directors of SAF and SAC.

The trial court found persuasive, by way of analogy, *Copperweld Corp. v. Independence Tube Corp.*, 467 U. S. 752 (104 SC 2731, 81 LE2d 628) (a Sherman Antitrust Act case), and concluded "[a] parent and its wholly-owned subsidiary have 'a complete unity of interest.' Their objectives and goals are the same, having been determined by one corporate entity, the parent. Therefore . . . a parent is not intruding into the affairs *of others*, but into its own affairs." Accordingly, the trial court held "a parent cannot tortiously interfere with a wholly-owned subsidiary as the parent and the subsidiary are essentially one. . . ."

If, as here, on motion to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in OCGA § 9-11-56. OCGA § 9-11-12 (b).

In order to constitute tortious interference with contract, "a *third person* must have maliciously *and without lawful justification* induced the breach of an existing contract or caused the termination of a recognized contractual relation." (Emphasis supplied.) 27 EGL, Torts, § 9. It appears to be a case of first impression whether in Georgia the corporate parent of a wholly-owned subsidiary or of the latter's wholly-owned subsidiaries cannot be deemed, as a matter of law, a *third party* capable of tortiously interfering with the contracts of

said subsidiaries. As a general principle of corporate law, "great caution should be exercised in disregarding or going behind the corporate entity, it may be done when the subsidiary is shown to be the alter ego or business conduit of the parent. However, it must appear that the subsidiary is a mere instrumentality of the parent. . . ." *Florida Shade &c. v. Duncan*, 150 Ga. App. 34 (256 SE2d 644). Nevertheless, in Georgia, "[t]ortious interference with contractual relations is applicable only when the interference is done by one who is a stranger to the contract." *Jet Air v. Nat. Union Fire Ins. Co.*, 189 Ga. App. 399, 403 (4) (375 SE2d 873). It has been held that a parent corporation, acting through its officers, directors, or agents normally will not stand in the relationship of a *third-party* stranger to the contract between its subsidiaries and another for purposes of tortious interference of contract. Compare *Morast v. Lance*, 631 FSupp. 474, 482 (11) (USDC N.D. Ga.); see also *Nexus Svcs. v. Manning Tronics*, 201 Ga. App. 255 (410 SE2d 810); *and Jet Air*, supra. Nevertheless, while the interests of a parent corporation generally will be consistent with that of a subsidiary, circumstances can arise under which these interests may differ. Accordingly, we question whether a bright-line test should be established to the effect that a parent corporation can never be held liable for tortious interference with a wholly-owned subsidiary's contract with another party. Rather, the better rule appears to be that of giving a qualified privilege to the parent corporation, permitting it to interfere with a wholly-owned subsidiary's, or the latter's wholly-owned subsidiary's, contractual relations with another party when the contract threatens a present economic interest of said subsidiary, absent clear evidence that the parent employed wrongful means or acted with improper purpose. *T. P. Leasing Corp. v. Baker Leasing Corp.*, 732 SW2d 480, 483 (3) (SC Ark.), citing *Phil Crowley Steel Corp. v. Sharon Steel Corp.*, 782 F2d 781 (8th Cir.); see generally Restatement of Torts 2d, §§ 766-769. Generally the issues of whether the parent employed wrongful means or acted with improper purpose would present questions of fact for the jury to decide, but the case may be decided as a matter of law where the evidence shows clearly and palpably that the jury could reasonably draw but one conclusion. See generally *Southern Trust Ins. Co. v. Braner*, 169 Ga. App. 567, 569 (1) (314 SE2d 241). In this case, we find genuine issues of material fact exist whether Broad or its officers acted in this matter on behalf of Broad or merely as agents of SAF, whether Broad employed a wrongful or legitimate means, and whether Broad acted with improper purpose to terminate the lease. Accordingly, we find the trial court erred in dismissing as premature the tortious interference claim.

*Judgments reversed. Pope and Cooper, JJ., concur.*

DECIDED JANUARY 31, 1991 —
RECONSIDERATION DENIED FEBRUARY 12, 1992 —

*Arnall, Golden & Gregory, William H. Kitchens, Robert L. Rothman, B. Ida Patterson*, for SunAmerica and Broad.

*Smith, Gambrell & Russell, Rex M. Lamb III, Matthew S. Coles, David M. Brown*, for 260 Peachtree.