In re HERCULES AUTOMOTIVE PRODUCTS, INC., Debtor.

J. Coleman Tidwell, Trustee, Plaintiff,

v.

Wedgestone Financial, Wedgestone Automotive Corporation, Wedgestone Partners, Fey Automotive Products, Inc., Resource Holdings Associates, PFG Corporation, Jeffrey S. Goldstein, John C. Shaw, James J. Pinto, David L. Sharp, Defendants.

Bankruptcy No. 96–10514–JDW.
Adversary No. 98–1019.

United States Bankruptcy Court,
M.D. Georgia,
Macon Division.

Oct. 29, 1999.

J. Coleman Tidwell, Wesley J. Boyer, Macon, GA, for Chapter 7 Trustee.

Valerie A. Hammett, Atlanta, GA, Robert T. Kugler, Minneapolis, MI, for Defendants.

### MEMORANDUM OPINION

JAMES D. WALKER, Jr., Bankruptcy Judge.

This matter comes before the Court on Motion for Partial Summary Judgment filed by Valerie A. Hammett and Robert T. Kugler, attorneys for Defendants Wedgestone Financial, Wedgestone Automotive Corporation, Wedgestone Partners, Fey Automotive Products, Inc., Resource Holdings Associates, PFG Corporation, Jeffrey S. Goldstein, John C. Shaw, James J. Pinto, and David L. Sharp ("Defendants").[1] Defendants seek summary judgment on certain counts in the complaint filed by J. Coleman Tidwell, Chapter 7 Trustee ("Trustee") for the bankruptcy estate of Hercules Automotive Products, Inc. ("Debtor"), including allegations that Defendants converted $204,167.00 belonging to Debtor; that Defendants converted Debtor's customer base; that Defendants converted inventory belonging to Debtor; that Debtor has a claim for conspiracy; that Defendants tortiously interfered with Debtor's contractual and business relations; that Defendants are holding certain business records of Debtor; and that Trustee may add other claims and defendants to this case. Defendants also ask the Court to strike Trustee's pleadings regarding 100,000 shares of Wedgestone Financial stock and regarding Debtor's customer base.[2] These are core matters within the meaning of 28 U.S.C. § 157(b)(2)(A), (E), and (O). After considering the pleadings, evidence and applica-

---

1. MCB Corporation, Richard A. Bartlett, Jerry M. Seslowe, and Eric H. Lee were dismissed in the "Consent Order Dismissing Claims" issued July 12, 1999.

2. The consent order of July 12, 1999 dismissed claims regarding accounting and insurance fees, as well.

ble authorities, the Court enters the following findings of fact and conclusions of law in compliance with Federal Rule of Bankruptcy Procedure 7052.

### Findings of Fact

In late 1994, Wedgestone Automotive Corporation ("Wedgestone Automotive")[3] formed Debtor, a Delaware corporation and its wholly-owned subsidiary, for the purpose of acquiring the assets of Hercules Bumpers, Inc. ("Hercules"). Debtor acquired Hercules' assets on January 9, 1995. Wedgestone Automotive was also the sole owner of Fey Automotive Products, Inc. ("Fey"), Hercules' principal in the automobile bumper industry. The asset purchase agreement made Wedgestone Automotive sole owner of two companies which together manufactured and distributed approximately half of all truck bumpers sold in the United States apart from those sold by the major automobile manufacturers themselves.

The principal markets of Hercules and Fey were distinct, but their respective interests nevertheless put them in natural competition with one another. Hercules sold its products primarily in the substantial bumper aftermarket that existed because rear bumpers were optional equipment on trucks sold in the consumer market at the time. Automobile dealers could purchase trucks without the optional rear bumpers and install Hercules' bumpers which were promoted as the strongest available. Successfully employing this sales strategy, Hercules dominated the aftermarket. Fey, on the other hand, sold its bumpers primarily to automobile repair shops in the after-crash market, which it dominated. Nothing about either Hercules or Fey's product, however, restricted it to its respective market. Hercules would have profited from inroads in the after-crash market, and Fey would have likewise profited from inroads in the aftermarket.

Defendants acknowledge that a substantial number of Trustee's claims raise questions of fact that must be decided at trial.[4] In the present motion the Court must nevertheless address some of these, both for the sake of context and for the bearing they have on this motion. The first pertains to Defendants' intent with regard to Debtor's purchase of Hercules' assets. While Defendants state that Fey first contacted Hercules about a potential merger in 1993, Trustee states that both Fey and Wedgestone Financial first contacted Hercules in 1992, not for the purpose of merger, but to purchase Hercules' customer list.[5] Trustee alleges that Fey and the Wedgestone group had no interest in merger until Hercules refused their offer to purchase its customer base and began negotiating with a company interested in purchasing and operating Hercules as a going concern. According to Trustee, the Hercules owners wanted to keep the Hercules business in operation while Defendants merely wanted to get Hercules' customer base and eliminate Hercules as Fey's competitor.

3. Wedgestone Automotive was a wholly-owned subsidiary of Wedgestone Financial. Though considerable reorganization of Wedgestone Financial has taken place since the petition of April 19, 1996, the Court will refer to Defendants as they existed on the date of the petition. All Defendants were either owners, officers, directors, or subsidiaries of Wedgestone Financial, or subsidiaries of its subsidiaries, or Defendants were entities having contractual relations with Wedgestone Financial, its subsidiaries or their subsidiaries, and were owned by major shareholders of Wedgestone Financial.

4. Defendants acknowledge remaining questions of fact with regard to allegations of actual fraud, breach of fiduciary duties, voidable preferences, and fraudulent transfers.

5. Before November 14, 1994, Fey was the automotive division of Standun, Inc. On November 14, 1994, Wedgestone Financial acquired Standun, Inc.'s automotive division assets and transferred them to Fey Automotive Products, Inc. On November 18, 1994, Wedgestone Financial created Wedgestone Automotive as a holding company for Wedgestone Financial's automotive industry assets.

There are questions regarding Hercules' financial condition when it was negotiating with Defendants. Trustee disputes the allegation that Hercules made no profit from 1985 to 1993, but he does not dispute the fact that when Debtor purchased Hercules' assets, "Hercules was a highly troubled business that would have to be turned around in order to survive." (Def.'s st. Undisputed Facts ¶ 35.) Perhaps to accomplish the needed turnaround, Defendants caused Debtor to enter into two separate, five-year management consultation service agreements with entities associated with the Wedgestone group, Wedgestone Partners and PFG Corporation ("PFG").[6] At present, the Court addresses only the nature of the funds Debtor transferred pursuant to these agreements. Defendants' intent in causing Debtor to enter into these agreements remains a question of fact for trial.

Pursuant to these agreements, Debtor paid Wedgestone Partners and PFG a total of $204,167.00. Trustee argues that there is no documentation indicating that Debtor ever received the services for which it contracted, and the facts are subject to interpretation: Arguably Wedgestone Partners and PFG fulfilled their contractual obligations to Debtor, but it could also be argued that they performed the services, not for Debtor as a distinct entity, but for the Wedgestone group as a whole. These considerations raise questions for trial. Of relevance to this motion, however, is that Debtor transferred $204,167.00 to Defendants pursuant to a contractual relationship that Debtor had with Wedgestone Partners and PFG.

While some Defendants had contractual obligations to Debtor, others, serving as its officers and directors, also owed it fiduciary obligations. Questions of fact remain regarding their conduct in managing Debtor's affairs. It is an undisputed fact, however, that in managing Debtor's affairs, Defendants caused Debtor to enter into a supply contract with Fey. In 1995, Debtor lost the supplier of a material necessary for the manufacture of its MSOET line, a specialty bumper that had been one of Hercules' most important products. Pursuant to Defendants' management decisions, Debtor replaced the MSOET line with the Surestep unit, a product manufactured by its competitor Fey.

While operating Debtor, Defendants also transferred a significant portion of Debtor's sales force to Fey. Again, Trustee may argue that Defendants' transfer of Debtor's sales force raises questions to be considered at trial, but of relevance to the Court's consideration of the present motion are facts pertaining to the nature of the customer base that Trustee alleges Defendants misappropriated. The pertinent facts are that no evidence indicates Debtor ever made, or took steps to protect, a tangible list of its customers, or that Fey ever received such a list, and no evidence indicates that Debtor ever made restrictive covenants with its salespersons.

In addition to questions regarding the nature of Debtor's property, the Court must address questions regarding the value of property Debtor obtained from Defendants. Debtor purchased 100,000 shares of Wedgestone Financial stock pursuant to a requirement, imposed by Charles W. Brady,[7] as a condition of his willingness to go forward with the asset purchase agreement, that Wedgestone Financial pay $100,000.00 in legal fees that he had incurred. To meet Brady's requirement, and with his agreement, Wedgestone Financial arranged for Debtor to purchase 100,000 shares of Wedgestone

6. Wedgestone Partners is a general partnership with John C. Shaw, direct or indirect owner of 38.8 percent of Wedgestone Financial's stock, as a general partner. James J. Pinto owns one hundred percent of PFG Corporation's stock, and a percentage of Wedgestone Financial's stock, as well.

7. Brady and Chattahoochee Leasing Corporation owned 90 percent of Hercules' outstanding stock.

Financial stock at a price of $100,000.00. Then within six months of the asset purchase Debtor would, at its option, either transfer the 100,000 shares of Wedgestone Financial stock to Brady, or pay him $100,000.00. Evidence in the record indicates that though Wedgestone Financial's stock traded for $1.04 per share at one point, it traded infrequently and at variable prices that were often considerably lower than $1.00 per share.

The events immediately precipitating the shutdown of Debtor's manufacturing operations in Pelham, Georgia, and the transfer of Debtor's plating line inventory valued at $308,000.00 also bears recitation here. Shortly before the shutdown of Debtor's facilities in February 1996, the local power company demanded that Debtor pay approximately $150,000.00 in power bills incurred by Hercules before Debtor purchased its assets. Though Debtor attempted to explain that it was a distinct entity from Hercules, the local power company threatened to shut off power to Debtor's facilities if the bills were not paid. Because Debtor had inventory at its facilities consisting of nickel in solution and related chemicals, the imminent power shutoff threatened to create hazardous waste problems. To address these threatened problems, Debtor transferred $308,000.00 in inventory to Fey. Trustee disputes none of this, but where Defendants state that the inventory was transferred to Fey "at cost," (Def.'s st. of Undisputed Facts ¶ 86), Trustee alleges that Debtor was not paid. Defendants cite no portion of the record substantiating payment.

### Conclusions of Law

Federal Rule of Bankruptcy Procedure 7056 adopts Federal Rule of Civil Procedure 56(c), which provides for the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). In *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the United States Supreme Court stated that "the party seeking summary judgment always bears the initial responsibility of informing the [Court] of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Because Defendants have moved for summary judgment on certain claims alleged by Trustee, they bear the initial burden of either negating factual elements essential to Trustee's claims on which they seek summary judgment, or to show that the record lacks evidence that Trustee must have in order to meet his burden of proof. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 606–09 (11th Cir.1991).

If Defendants meet their initial burden, then the burden shifts to Trustee to "set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e). If Trustee fails to meet his burden imposed by Rule 56(e), then entry of summary judgment for Defendants is mandated. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. Trustee is entitled to have the Court believe his evidence, however, and if the evidence raises an issue of material fact for trial, summary judgment will be denied. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–55, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

I. *Interwoven web of relations negates Trustee's ability to show requirements of "stranger doctrine" essential to tortious interference claim*

Defendants have moved for summary judgment on Trustee's claims for tortious interference with contract and malicious interference with Debtor's business relations. In Georgia law, though tortious interference with contractual relations and

tortious, or malicious, interference with business relations are distinct torts, they nevertheless have similar elements. *See Britt/Paulk Ins. Agency, Inc. v. Vandroff Ins. Agency, Inc.*, 952 F.Supp. 1575, 1581 (N.D.Ga.1996). Both claims require Trustee to show that Defendants were strangers to Debtor's contractual or business relations. *See Atlanta Mkt. Ctr. Management Co. v. McLane*, 269 Ga. 604, 609 n. 2, 503 S.E.2d 278, 283 n. 2 (1998) (common "stranger doctrine" applies to distinct torts of interference with business relations and interference with contractual relations). The evidence shows that Defendants were not strangers to Debtor's contractual or business relations, and thus cannot be subjected to a claim that they tortiously interfered with them.

■ A stranger to a contractual or business relation is an " 'intermeddler' acting improperly and without privilege." *Renden, Inc. v. Liberty Real Estate Ltd. Partnership*, 213 Ga.App. 333, 336, 444 S.E.2d 814, 818 (1994). Georgia courts prescribe no test for identifying a stranger, but in *Britt/Paulk* the court listed a number of factors based upon which Georgia courts have identified parties who were not strangers to complainants' contractual or business relations, and against whom complainants improperly alleged claims of tortious interference. *See* 952 F.Supp. at 1584. Of these factors, the most pertinent holds that if Defendants and Debtor were both "parties to a comprehensive interwoven set of contracts or relations," then Defendants were not strangers to Debtor's business or contractual relations. *Id.*

In its recent decision in *Atlanta Mkt. Ctr.*, the Georgia Supreme Court endorsed a line of cases that restricts the scope of possible defendants vulnerable to tortious interference claims. *See Atlanta Mkt. Ctr.*, 269 Ga. at 610, 503 S.E.2d at 283–84. These cases restrict the number of possible defendants subject to tortious interference claims by placing restrictions on the number of persons who may be "strangers" to complainants' business and contractual relations. *Id.* Another line of cases applied a more expansive interpretation of the term "stranger" as applied in tortious interference questions. *Sunamerica Fin., Inc. v. 206 Peachtree St., Inc.*, 202 Ga.App. 790, 415 S.E.2d 677 (1992), is representative of this line of cases. In *Sunamerica*, rather than holding that parents could not be strangers to their subsidiaries' relations as matter of law, the court gave parents a qualified privilege to intervene in their subsidiaries' business and contractual relations. *Sunamerica*, 202 Ga.App. at 797–98, 415 S.E.2d at 684. The court held that under some circumstances, a parent might be a stranger to its subsidiary's relations, and a claim against the parent for tortious interference could be sustained.

■ Specifically disapproving of *Sunamerica* by name, the Georgia Supreme Court held in *Atlanta Mkt. Ctr.* that "all part[ies] to an interwoven contractual arrangement are not liable for tortious interference with any of the contracts or business relationships." *Atlanta Mkt. Ctr.*, 269 Ga. at 610, 503 S.E.2d at 283–84 (citing *Jefferson–Pilot Communications Co. v. Phoenix City Broad., Ltd.*, 205 Ga.App. 57, 60, 421 S.E.2d 295, 298–99 (1992) with approval). It follows from the holding in *Atlanta Mkt. Ctr.* that as a matter of law, a parent corporation cannot be a stranger to its subsidiaries' business or contractual relations, and that no claim can be sustained against a parent for tortious interference with such relations. Based upon *Atlanta Mkt. Ctr.*, this Court must conclude that because Debtor was created and operated as a subsidiary of Wedgestone Automotive within the interwoven set of fiduciary and contractual relations that constituting the Wedgestone Financial conglomerate, Trustee can maintain no claim against Defendants for tortious, or malicious, interference with Debtor's business or contractual relations.

■ This conclusion applies to any claim for tortious interference as applied to Fey as well. The *Atlanta Mkt. Ctr.* holding

bars claims against parents for tortious interference with their subsidiaries' relations, but the court articulated no such principle barring tortious interference claims brought against siblings. Nevertheless, while it is true that Fey was in natural competition with Debtor, and that Fey itself owed no fiduciary obligation to Debtor, even Fey appears to have had a contractual relation of its own with Debtor.[8]

The facts do not explicitly state, and the Court does not find, that Fey supplied the Surestep unit directly to Debtor. If it did, however, then Fey had a relationship with Debtor similar to the one the defendant in *Britt/Paulk* had with the plaintiff. In *Britt/Paulk*, the defendant was a supplier of insurance products, and the plaintiff was a distributor of the insurance products that defendant supplied. The court determined that the multi-tiered marketing structure created by contracts between the plaintiff and defendant prevented the defendant from being a stranger to the plaintiff's business relations with customers who purchased the products supplied by the defendant. *See Britt/Paulk*, 952 F.Supp. at 1585. The factual distinction between *Britt/Paulk* and this case is that in *Britt/Paulk*, the plaintiff served as agent for the distribution of the defendant's products, while in this case, Debtor sold Fey's product in place of one that it had manufactured itself. The factual distinction does not change the legal import of *Britt/Paulk* to this case, however, which rests upon the "series of dependent relationships" created by multi-tiered marketing structures like the one central to matters in *Britt/Paulk*, or the one between Fey and Debtor, which though peripheral, was constitutive of the larger interests of Wedgestone Financial. *See id.* Furthermore, this same analysis would apply even if Fey did not directly supply the Surestep bumpers to Debtor.

Even if Debtor acquired the Surestep bumpers indirectly from Fey, Trustee still could not show that Fey was a stranger to Debtor's business relations. The Surestep bumpers may have passed from Fey through an intermediary to Debtor, or perhaps the bumpers never actually passed directly to Debtor but rather were delivered directly to Debtor's customers, and of course, there may have been arrangements that the Court has not contemplated. Nevertheless, such arrangements would not break the series of dependent relationships that defeat the essential "stranger" element of tortious interference that Trustee must establish to sustain this claim. Instead, the series of dependent relationships would have been expanded.

Pursuant to the Georgia Supreme Court's holding in *Atlanta Mkt. Ctr.* that the stranger doctrine restricts the number of possible defendants subject to tortious interference claims, it is appropriate to treat the arrangement by which Debtor obtained Surestep bumpers from Fey, regardless of its structure, as constitutive of the set of interwoven relations to which both Fey and Debtor were parties. Even Fey, Debtor's natural competitor, was no stranger to Debtor's business or contractual relations. Thus, summary judgment must be granted for Defendants because Trustee cannot show an essential element of his claim for tortious interference with Debtor's contractual and business relations.

II. *Trustee has no claim for conversion of $204,167.00 or customer base; fact question remains regarding inventory*

■ Defendants seek summary judgement on allegations that they converted certain items of Debtor's property, including $204,167.00 Debtor paid Wedgestone Partners and PFG, the allegedly misappropriated Hercules' customer base, and $308,000.00 in inventory transferred to

8. Fey's president, Defendant David L. Sharp, was also president of Wedgestone Automotive and Debtor. Accordingly, Sharp owed Debtor fiduciary duties though Fey did not.

Fey when Debtor terminated its manufacturing operations. The prima facie case for conversion actions is stated in *City of College Park v. Sheraton Savannah Corp.*, 235 Ga.App. 561, 509 S.E.2d 371 (1998). As to each item of property, Trustee must prove (1) that Debtor has title to the property, (2) that Debtor has the right to possess it, (3) that Defendants have possession of the property, (4) that Defendants have refused demands to turn it over, and (5) the value of the property. *College Park*, 235 Ga.App. at 564, 509 S.E.2d at 374.

A. *Because $204,167.00 was paid pursuant to contract Trustee cannot show Debtor's title*

Trustee has no action for Defendants' conversion of the $204,167.00 paid Wedgestone Partners and PFG because the money was paid pursuant to a contract for services. Because it was paid to Wedgestone Partners and PFG, title to the money passed to them with possession. Trustee is thus unable to meet the first element of the prima facie case for conversion as prescribed in *College Park* because he cannot show that Debtor has title to the money.

▆▆▆▆ The Georgia Court of Appeals has held that "[i]f there is no liability except that arising out of breach of the express terms of [a] contract, the action must be in contract[.]" *Commercial Bank & Trust Co. v. Buford*, 145 Ga.App. 213, 215, 243 S.E.2d 637, 638–39 (1978). Georgia courts do allow claims for conversion of money. *Hudspeth v. A & H Constr.*, 230 Ga.App. 70, 71, 495 S.E.2d 322, 323 (1997). If the money is paid pursuant to a contract, however, the claim cannot be based on the breach of duties created by the contract. Distinct from a claim *ex contractu*, a conversion claim for money must be based on a breach of duties, distinct from contractual obligations, arising either from statute or flowing from relations created by the contract. *See Unified Services, Inc. v. Home Ins. Co.*, 218 Ga.App.

85, 87, 460 S.E.2d 545, 547–48 (1995); *Commercial Bank & Trust*, 145 Ga.App. at 214–15, 243 S.E.2d at 638–39. Furthermore, a claim for conversion of money must establish that the allegedly converted money is specific and identifiable, or specifically "earmarked" for some particular purpose. *Hudspeth*, 230 Ga.App. at 71, 495 S.E.2d at 323; *Unified Services*, 218 Ga.App. at 89, 460 S.E.2d at 549. Earmarking overcomes the presumption that one in possession of money has title to it, thus allowing the complainant to establish the first element of the prima facie case for conversion, i.e., that plaintiff has title to the allegedly converted property. *See generally Adler v. Hertling*, 215 Ga.App. 769, 772–74, 451 S.E.2d 91, 96–97 (1994)("specific and identifiable" nature of funds necessary to establish plaintiff's title and right to possess).

In *Unified Services*, an insurance broker was contractually obliged to accept its client's premium payments and remit the money to the insurer. In defense to the insurer's claim against it for conversion of funds it received from the client but which it did not remit, the brokerage argued that the insurer's action was properly on the contractual obligation to remit the premium, not in tort. The court pointed out, however, that pursuant to Georgia statute, the broker was deemed the agent of both the insurer and the client for the purpose of collecting and remitting the premium. *Unified Services*, 218 Ga.App. at 87–88, 460 S.E.2d at 548. The insurer thus properly based its action *ex delicto* on extracontractual duties created by statute. *Id.*

As stated *supra*, however, an action for conversion of money requires more than an extra-contractual basis for the action. The plaintiff must also show that the allegedly converted money was earmarked for some particular purpose, or that the money can otherwise be specifically identified as money held by the defendant to which the plaintiff continues to hold title. Failing this, the plaintiff cannot meet the first

elements of the prima facie case for conversion.

In *Hudspeth,* the defendant received money from the plaintiff specifically for the purpose of purchasing real property in which the plaintiff was to receive a one-third interest. Focusing on the issue of "earmarking," the court did not address the defendant's extra-contractual duties to the plaintiff.[9] Rather, the court focused on the fact that because the money was earmarked for a specific purpose, it was specifically identifiable as money in the defendant's possession to which the plaintiff had not surrendered title. *Hudspeth,* 230 Ga.App. at 71, 495 S.E.2d at 323 (citing *Unified Services,* 218 Ga.App. at 89, 460 S.E.2d 545); *and see Adler,* 215 Ga.App. at 772–74, 451 S.E.2d at 96–97. Earmarking thus allowed the plaintiff to show the first element of the prima facie case for conversion as outlined in *College Park.*[10]

■ The facts of this case make it clear that Trustee cannot establish the first element of conversion as outlined in *College Park.* In *Unified Services,* the insurance broker received a specifically identifiable sum of money earmarked for the purpose of remitting it to the insurer, and in *Hudspeth,* the defendant received a specific sum of money earmarked for the purpose of purchasing a one-third interest in a parcel of real estate. The evidence indicates no purpose for Debtor's payment of $204,167.00 to Defendants other than to meet Debtor's contractual obligation to pay for services. When possession of the $204,167.00 passed from Debtor to Defendants, title passed with it, and any action for the money paid should properly be on the contract. Given the foregoing, summary judgment must be granted for Defendants on Trustees allegations that they converted the $204,167.00 that Debtor paid them.

**B.** *Georgia statute supercedes conversion action for customer base*

Trustee has no action against Defendants for their conversion of Debtor's customer base because Georgia's Trade Secrets Act of 1990[11] (the "Act") "supercede[s] conflicting tort, restitutionary, and other laws of [Georgia] providing civil remedies for the misappropriation of a trade secret." O.C.G.A. § 10–1–767(a). The alleged customer base, or Debtor's customer "list," to use the language of Georgia law, is defined by statute to be a "trade secret," a term which "means information including ... a list of actual or potential customers[.]" O.C.G.A. § 10–1–761(4).

■ Pursuant to O.C.G.A. § 10–1–767(a), the remedies provided by the Act for misappropriation of a trade secret are exclusive. Thus, Trustee's only remedy for the alleged misappropriation of Debtor's customer base would either be a suit in equity for injunctive relief under O.C.G.A. § 10–1–762, or an action for damages under O.C.G.A. § 10–1–763. Neither is available to Trustee, however, because Debtor did not take the steps necessary under Georgia law to protect its customer base as a trade secret.

To ensure that its customer list would be recognized as a trade secret subject to the Act's protection, Debtor should have reduced its customer list to tangible, written form. Before the Georgia General Assembly adopted the Act, the Georgia Su-

---

9. Such duties nevertheless existed. The defendant owed the plaintiff the duties of a co-adventurer, thus allowing an extra-contractual basis for the tort claim. Also, note that in *Unified Services,* the brokerage, deemed an agent, never had title to the money. The insurer, as the brokerage's principal, acquired title to the money immediately upon the brokerage's receipt of it.

10. The court of appeals' analysis did not address the first element of conversion, but it based its holding that an action for conversion of money would lie for earmarked money on *Unified Services,* which in turn based its holding on *Adler.*

11. Codified at O.C.G.A. §§ 10–1–760 to 10–1–767.

preme Court categorically held that "[c]ustomer lists are not trade secrets." *See Am. Photocopy Equip. Co. v. Henderson*, 250 Ga. 114, 115, 296 S.E.2d 573, 575 (1982). Then in *Avnet, Inc. v. Wyle Lab., Inc.*, 263 Ga. 615, 437 S.E.2d 302 (1993), decided subsequent to the Act's adoption, the court narrowly construed the definition of "trade secret," limiting it to tangible lists of customers reduced to a written form of some sort. 263 Ga. at 620, 437 S.E.2d at 305; *see also Amerigas Propane v. T–Bo Propane*, 972 F.Supp. 685, 696–98 (S.D.Ga.1997) (citing *Allen v. Hub Cap Heaven, Inc.*, 225 Ga. App. 533, 536, 484 S.E.2d 259, 263 (1997) and *DeGiorgio v. Megabyte Int'l, Inc.*, 266 Ga. 539, 540, 468 S.E.2d 367, 369 (1996)) (1996 amendments did not abrogate *Avnet* holding that protected customer lists must be in tangible form).

▮ Trustee has presented no evidence that Debtor ever reduced its customer list to tangible, written form, nor has he presented evidence that Defendants misappropriated such a tangible list belonging to Debtor. To the contrary, Trustee's pleadings indicate that no such tangible list existed. Trustee's allegation is that Defendants misappropriated the customer base by transferring Debtor's sales personnel to the employ of Fey, effectively asking the Court to hold Defendants liable for conversion of knowledge that Debtor's sales personnel gained while in Debtor's employ.

There are two critical problems with the claim Trustee attempts to articulate. First, Trustee's allegations do not, and as explained *supra* they cannot, constitute a conversion claim. Even if Debtor had taken steps to protect its customer list as a trade secret, its salespersons' use of their knowledge of the information contained in the list could have been limited only through legally valid, enforceable restrictive covenants. *See Amerigas*, 972 F.Supp. at 697. If Debtor had entered into such restrictive covenants with its former employees, Trustee would have an action against them because the Act expressly states that it does not affect such contractual duties or remedies. *See* O.C.G.A. § 10–1–767(b)(1).[12] Thus to the extent Debtor had restrictive covenants with its former salespersons, Trustee's allegations should have been stated as claims against them for use of information gained while employed in Debtor's sales force.

The second problem with Trustee's claim becomes apparent when the Court considers the fact that no evidence in the record indicates that Debtor ever entered into restrictive covenants with its former salespersons. Though in theory Trustee would have had a claim against Debtor's employees for use of information they gained while working for Debtor, he would have to base the claim on enforceable restrictive covenants, and Trustee has presented no evidence that Debtor had restrictive covenants with members of its sales force.

Summary judgment for Defendants on Trustee's allegations that they converted Debtor's customer base must be granted. This does not mean, however, that evidence of Defendants' transfer of Debtor's sales force to Fey is irrelevant to the issues remaining for trial. See O.C.G.A. § 10–1–767(b)(2).[13] Defendants' transfer of Debtor's sales force to Fey may support Trustee's allegation that they never intended to operate Debtor as a going concern and that Defendants only intended to

---

**12.** O.C.G.A. § 10–1–767(b)(1) states that

(b) This article shall not affect:

(1) Contractual duties or remedies, whether or not based upon misappropriation of a trade secret; provided, however, that a contractual duty to maintain a trade secret or limit use of a trade secret shall not be deemed void or unenforceable solely for

lack of a durational or geographical limitation on the duty[.]

**13.** O.C.G.A. § 10–1–767(b)(2) states that

(b) This article shall not affect:

(2) Other civil remedies that are not based upon misappropriation of a trade secret[.]

obtain Hercules' customer base and eliminate Hercules as a competitor of Fey. Furthermore, the fact that Defendants did not cause Debtor to take the steps necessary to protect its customer base may be evidence of Defendants' alleged breach of their fiduciary duties to Debtor. Of course, the Court will not consider or weigh such evidence until trial. Here, the Court holds only that though such evidence may be relevant to matters remaining for trial, that same evidence prevents Trustee from sustaining an action against Defendants for misappropriation of Debtor's customer base.

### C. *Question of fact remains as to whether Defendants converted inventory belonging to Debtor*

In their Statement of Undisputed Facts, Defendants state that Debtor transferred $308,000.00 in inventory to Fey "at cost" when it shut down operations at its facility in Pelham, Georgia. (Def.'s st. Undisputed Facts at ¶ 86.) It is not entirely clear what Defendants mean when they say the inventory was transferred "at cost." Presumably Defendants mean they paid Debtor its cost for the materials, but Trustee has argued that Debtor was not paid.

The question presented would have been easily settled had Defendants pointed to evidence, or introduced evidence into the record, that Debtor received payment for the inventory, or otherwise received a credit offsetting any amount it might have owed other members of the Wedgestone group. Defendants would have thus shifted the burden to Trustee to come forward with evidence showing the contrary. FED.R.CIV.P. 56(e). Defendants have not met their burden, however, and summary judgment must be denied.

### III. *Certain allegations relevant to issues of material fact that remain for trial*

Defendants have moved for summary judgment on Trustee's allegations of conspiracy, and they have moved to strike Trustee's pleadings regarding the value of its customer base and the value of 100,000 shares of Wedgestone Financial stock that Debtor purchased. The Court finds that Defendants' motion with respect to each of these should be denied. Trustee's action in conspiracy is appropriately pleaded, and the Trustee's valuations of the alleged customer base and the 100,000 shares of Wedgestone stock are relevant to issues of material fact remaining for trial.

### A. *Conspiracy is appropriately plead as an aggravating factor in civil actions*

Defendants have misunderstood the holding of the case they cited, *Savannah College of Art & Design, Inc. v. Sch. of Visual Arts of Savannah, Inc.*, 219 Ga. App. 296, 464 S.E.2d 895 (1995). The court in *Savannah College* did state that a civil conspiracy " 'of itself furnishes no cause of action.' " 219 Ga.App. at 297, 464 S.E.2d at 896 (quoting *Cook v. Robinson*, 216 Ga. 328, 328–29, 116 S.E.2d 742, 744–45 (1960)). The meaning of this phrase, however, is not that conspiracy is improperly pleaded in a civil action, but that conspiracy alone is insufficient to support a civil action.

Unlike criminal conspiracy, which is a crime in itself, a civil conspiracy cannot be pleaded as the gravamen of a civil complaint. Nevertheless, conspiracy may be "pleaded and proved as aggravating the wrong of which the plaintiff complains, enabling him to recover in one action against all defendants as joint tortfeasors." *Cook*, 216 Ga. at 329, 116 S.E.2d at 745. Trustee's claim for conspiracy to defraud is thus appropriate, and Defendants' motion for summary judgment will be denied.

### B. *Evidence of customer base's value is relevant to essential element of damages in Trustee's remaining claims though no claim for misappropriation exists*

As stated earlier in this opinion, Debtor has no claim for Defendants' mis-

appropriation of Debtor's customer base. Nevertheless, Trustee presents evidence valuing the customer base that may be relevant to the material issue of damages remaining in certain claims, including fraud and breach of fiduciary duties, that must be tried. Accordingly, though the Court grants summary judgment for Defendants on Trustee's claim for conversion of the customer base, the Court will not strike Trustee's pleadings regarding its value.

### C. *Material issue of fact remains regarding valuation of 100,000 shares of stock Debtor purchased from Wedgestone Financial*

▉ Defendants argue that Trustee has no basis upon which to avoid Debtor's payment of $100,000.00 for 100,000 shares of Wedgestone Financial stock. The gist of Defendants' argument is that because Wedgestone Financial's stock traded at $1.04 per share in November 1994, Debtor received reasonably equivalent value for the $100,000.00 it paid. Trustee presents evidence, however, that the trading price of Wedgestone Financial's stock fluctuated widely. Because the reasonably equivalent value of the 100,000 shares of stock Debtor purchased might have been considerably below the $100,000.00 paid, the stock's value is an issue of material fact for trial. Trustee's claim is thus appropriate, and the Court will not strike his pleadings with respect to it.

### IV. *The Court's discretion governs amendment of claims and joinder of defendants*

▉ Trustee has not made a request pursuant to Federal Rule of Civil Procedure 15, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7015, to add new claims by amending his pleadings. Trustee will be allowed to amend his pleadings "only by leave of the court or by written consent of the adverse party; and leave shall be freely given [if] justice so requires." FED. R.

CIV. P. 15. The Court will have broad discretion, depending upon the circumstances prevailing when, and if, Trustee moves to amend his pleadings to grant or deny his request. *See Campbell v. Emory Clinic,* 166 F.3d 1157, 1162 (11th Cir.1999). It would be premature for the court to rule at this time on any claims that Trustee may or may not wish to bring by amending his complaint without having first considered the requirements of justice with respect to the claim.

The Eleventh Circuit has stated that "[p]rejudice and undue delay are inherent in an amendment asserted after the close of discovery and after dispositive motions have been filed, briefed, and decided." *Id.* (citing *Jameson v. Arrow Co.,* 75 F.3d 1528, 1534 (11th Cir.1996)). Thus, it may not be an abuse of the Court's discretion to deny any request to add claims that Trustee might submit subsequent to the rendering of this opinion simply because any such request would necessarily come after the disposition of this motion for partial summary judgment. This observation will be given its due weight should Trustee seek to amend his complaint, but justice may nevertheless require the Court to grant Trustee leave to amend his pleadings. It would be an abuse of the Court's discretion to dismiss at present any future claims Trustee may seek to add without having first considered the requirements of justice respecting them.

▉ Similar considerations control the possible addition of other defendants. The applicable procedural rules are FED. R.BANKR.P. 7019, which adopts FED. R.CIV.P. 19. Given that the operative terminology in Rule 19 provides circumstances under which "[a] person ... *shall* be joined as a party in the action," it may even be mandatory for the court to order an as yet undiscovered and unnamed defendant to be joined in this action. *See* FED.R.CIV.P. 19(a) (emphasis added). While it is unlikely that such a necessary defendant will be discovered, given that litigation in this case is in its latter stages

with discovery closed and dispositive motions filed, it is nevertheless premature for the Court to say that such a defendant does not exist. Therefore, Defendants' motion for summary judgment on the addition of other claims or defendants must be denied.

V. *Defendants stand "ready, willing, and able" to turn Debtor's business records over at Trustee's request*

Trustee does not oppose Defendants' motion for summary judgment with respect to the turnover of Debtor's business records, and Defendants have stated that they "remain ready, willing, and able" to turn business records of Debtor that they are holding over to Trustee at his request. (Def.'s Opening br. in Support of Motion at p. 5.) Given these conditions, Defendants' motion with respect to Count VII of the complaint will be granted.

*Conclusion*

Trustee cannot sustain his claims for tortious interference with Debtor's contractual and business relations, for conversion of $204,167.00 Debtor paid pursuant to contractual obligations, or for conversion of Debtor's customer base. With regard to these claims, summary judgment will be granted. Summary judgment will also be granted on Count VII for lack of opposition. Trustee's remaining claims, including his allegations of conspiracy and conversion of $308,000.00 in inventory raise issues of material fact. Also, his pleadings regarding the value of 100,000 shares of Wedgestone Financial stock and his pleadings regarding the value of Debtor's customer base are relevant to remaining issues of material fact. Summary judgment will be denied with regard to these matters.